15702

YOUNG v. LEVY *ET AL.*

(32 S. E. (2d), 889)

8

*Mr. Shepard K. Nash, Mr. A. S. Merrimon,* and *Mr. Wendell M. Levi,* all of Sumter, S. C., Counsel for Appellant,

*Mr. Raymon Schwarz,* of Sumter, S. C., and *Mr. Richard A. Palmer* of Florence, S. C., Counsel for Respondents,

January 16, 1945.

Mr. Associate Justice Stukes delivered the Majority Opinion of the Court; Mr. Associate Justice Taylor filed a Dissenting Opinion, and Mr. Chief Justice Baker filed an Opinion concurring in the dissent:

The Opinion of the Court follows:

Careful consideration of the voluminous record in this case has not convinced me to the extent necessary in such a controversy that respondent is entitled to specific performance of the alleged contract, and on that account I must respectfully dissent from the conclusion reached by Mr. Justice Taylor. With all due deference to the opinion and the writer, I submit that it was commenced in error when it was asked: "Is there competent and substantial evidence in the record to support the finding of fact by the Master in Equity concurred in by the Circuit Judge?" That, I think, is not the proper query in this case. More is necessary for affirmance, as I think, is easily demonstrable.

I do not question the authority of *Alderman v. Alderman*, 178 S. C., 9, 181 S. E., 897, 105 A. L. R., 102, upon the point of the propriety of the rule there stated and applied, to wit, that concurrent factual findings of the master and trial Judge in an equity case will not be disturbed upon appeal unless they are without evidence to support them or are against the clear preponderance of the evidence. It is a concidence that I was of counsel in that case and argued for the rule which was already well established by prior decisions. The case has since been cited too many times to admit doubt of its authority. But this rule of the decisions ("court-made law") should not be so construed as to conflict with the constitutional powers and duties of this Court. The latter are set forth in considerable detail in our Constitution of 1895, Art. 5, and I quote in part Section 4: "And said Court shall have appellate jurisdiction only in cases of chancery, and in such appeals they shall review the findings of fact as well as the law, except in chancery cases where the facts are settled by a jury and the verdict not set aside, and shall constitute a Court for the correction of errors at law under such regulations as the General Assembly may by law prescribe."

Thus in chancery appeals (such as this) we "shall revew the findings of fact," which provision very plainly confers the jurisdiction so to do and creates the corresponding duty.

Moreover, I think that the Master misconceived the law (with respect to the quantum of proof necessary) which is peculiarly applicable to this case, and that his factual findings were influenced by this error of law, in which the trial Judge followed him. Thus a situation was created in which the rule of *Alderman v. Alderman, supra,* however broadly interpreted, is not an answer to this appeal. I refer to the well and widely established principle that Courts do not countenance specific performance of parol

contracts to devise unless the evidence *compels conviction* that there was such a contract and that it has been performed by the promisee unless complete performance becomes impossible through no fault of the latter. The ordinary rule of preponderance or greater weight of the evidence, applicable to civil actions generally, is insufficient in this class of cases; some Courts require proof beyond a reasonable doubt, as on the criminal side; universally a higher degree of convction of truth is necessary than in the usual civil case.

The failure of the distinguished Master and Circuit Judge to fully recognize and follow this governing rule in the trial of this case resulted, I think, in erroneous conclusions. It received very scant attention in the report and decree, yet it was properly of controlling importance. The case appears to have been tried as if it were an ordinary civil action, with only the usual rules of evidence applicable but, as has been (and will be further) pointed out, it is not.

The only authority cited in the decree (which adopted the Master's Report by reference) was *Erskine v. Erskine*, 107 S. C., 233, 92 S. E., 465, 467, in which the alleged contract *was not upheld* and it was said in the excellent circuit decree which was published by this Court, as follows: "But such a contract, especially when it is attempted to be established by parol, is regarded with suspicion, and not sustained, except upon the strongest evidence that it was founded upon a valuable consideration and deliberately entered into by the decedent. The evidence to sustain it should be received and scrutinized with the greatest care. The terms of such an agreement should be definite and certain and established by evidence clear and convincing. It has also been said by our Supreme Court that the terms of the agreement should be unambiguous and definitely ascertained. *Dicks v. Cassels,* 100 S. C. [341], 348, 84 S. E., 878, and cases cited; *Wilson v. Gordon,* 73 S. C., [155], 160, 53 S. E.,

79; *McKeegan v. O'Neill,* 22 S. C. [454], 468; *Church of the Advent v. Farrow* [28 S. C. Eq., 378], 7 Rich. Eq. [378], 383."

And this Court there said in addition: "* * * Plaintiff failed to prove his case by *that measure of proof required in cases like this,* which is stated in the decisions cited by the circuit court." (Emphasis added.)

The Master relied largely on *Bruce v. Moon,* 57 S. C., 60, 35 S. E., 415, and quoted extensively from the fine opinion by Chief Justice McIver. But I think it appears clearly from a consideration of it that the case is not apposite here. There, there was undoubtedly a contract, and it was evidenced in writing. The will, which was "enforced" in part by the decision, included the terms of the agreement, and the trial Judge properly said that it was more than a will, really a contract, and binding upon both parties. (More will be later said with reference to the will in this case under which it is proposed that respondent recover. It contained no element of a contract. All agree that it was prepared by competent attorneys of Rocky Mount, North Carolina. They included in it no reference to a contract and neither of the attorneys was able to recall testator's conversation upon the subject which respondent testified to in detail. Incidentally, in the relation by respondent of this conversation she did not, at least, tell the whole truth for the attorneys must have been instructed to include the provision relating to testator's mother for otherwise it would not have been incorporated in the will.) It seems to me that this vital difference in the facts of *Bruce v. Morton, supra,* and the instant case, makes it of little value; and the learned Master erred when he depended so strongly upon the authority of it.

An exhaustive, but I think not very satisfactory, annotation upon the subject is found at 69 A. L. R., 14, supplemented (I think in better form) in 106 A. L. R., 742. From the latter (in which the late authorities are collected),

at page 748, the following is quoted: "A proceeding for the specific enforcement of a contract to devise or bequeath the property of the promisor, being an effort, by a contract resting in parol, to distribute the estate of a deceased person in a different way from that provided by law, has uniformly, together with the evidence relied upon to establish the contract, been looked upon with jealousy, and the evidence to establish it will be weighed in the most scrupulous manner."

And from page 758: "As pointed out in the earlier annotation, it seems that in order that part performance may operate to take a contract of the kind under consideration herein out of the operation of the Statute of Frauds, the services must be exceptional and extraordinary in character, or it must appear that the promisee's whole course of life was changed by performance of the contract."

And possibly out of order, but to collect here together all quotations from this annotation, the following excerpts are taken from pages 765 and 766:

"The mere fact that services of a valuable character have been performed in the expectation of a legacy is not sufficient to entitle the person performing them to equitable aid; it must also appear that the promisor actually obligated himself to make this disposition of his property; and thus evidence of statements by the promisor tending to prove a mere disposition to devise by will, or convey by way of gift or a reward, for services, is not sufficient to entitle the beneficiary to specific performance of the contract; there must be shown a real contract to devise by will, made before the performance of the acts relied upon.

"It is frequently contended that a will executed by the promisor in compliance with his contract is a sufficient memorandum to satisfy the Statute of Frauds.

"Thus in *Holsz v. Stephen,* 362 Ill., 527, 200 N. E., 601, 106 A. L. R., 737, a contention of this type was made,

but the court in this instance held that the will in question contained no intimation that it was executed in pursuance of any contract; that upon its face it purported to be nothing more than a gift of the property involved, and was thus not sufficient to satisfy the statute.

"And to the same effect are *Luders v. Security Trust & Sav. Bank,* 1932, 121 Cal. App., 408, 9 P. (2d), 271; *Ortman v. Ortman,* 1933, 45 Ohio App., 551, 187 N. E., 588; *Hathaway v. Jones,* 1934, 48 Ohio App., 447, 194 N. E., 37; *In re: Byrne's Estate,* 1936, 122 Pa. Super., 413, 186 A., 187."

"As stated in the previous annotation, the fact that an alleged oral contract is out of harmony and inconsistent with a will made by the promisor subsequently to the time when it is alleged that he entered into the contract in question, is entitled to be taken into consideration as bearing upon the improbability of the contract having been made as alleged."

The stringent rule of the quantum of proof required ██ results (when the alleged contract rests in parol) from the fact that such a contract is in the teeth of the Statute of Frauds and specific performance (or its equivalent) is properly allowable only when enforcement of that statute would result in a fraud upon the promisee. Only in prevention of fraud do Courts allow a violation of the statute. Furthermore, sometimes, as in this case where there was a subsequent contrary will, the granting of the relief sought would result in denying the deceased the power of disposing of his property by last will as he sees fit, which is a prime right (with now inapplicable statutory limitations) of the possessor of property. Here the latter has a special appeal to a Court of equity for the testator had accumulated a considerable estate by his industry and thrift. So many of his race are "under-privileged". By his own efforts, he was not. And his last will, that thwarted by the decree under review, appears to provide a fair distribution of the estate

among all of the natural objects of testator's bounty and affection (his son, his brothers and sisters) except the respondent, his sister, whose omission is explained in the will by a recital that liberal gifts and advances had been already made to her.

Respondent testified that she was present at the will-drafting in Rocky Mount and that decedent did tell his lawyers about the alleged contract, and there is grave doubt in my mind that such testimony was admissible in view of the provisions of Code Sec. 692, relating to testimony by a litigant regarding conversations and transactions with a person deceased—this because, according to her testimony, she was a party to the alleged transaction, of which the making of the will was a part, in fact, the consummation so far as testator was concerned. Was she not then a party to the transaction in the lawyers' office and her testimony thereabout incompetent in this case? Certainly, I do not think its admission was warranted by the decisions cited to the point. See to the contrary what was said by the Court in *Merck v. Merck,* 89 S. C., 347, 71 S. E., 969, Ann. Cas., 1914-A, 937. I think the problem has been considered too much as involving only a *communication,* rather than a *transaction,* which latter the preparation of the will was, according to respondent's theory of her case. Suppose she had accompanied testator to a bank, instead of a lawyer's office, for the purpose of his making a deposit to her credit pursuant to a contract with her, and she had seen him place a thousand dollars on the counter and heard him tell the cashier that he wanted it deposited to her credit, in compliance with a stated contract between them, and instead the bank had credited it to his account, could she in a suit by her against his estate testify to the decedent's statement of the contract and direction to the banker! I think not, under the Statute, for their visit to the bank and the business there was

a part of their transaction. And I see no distinction between this supposed case and the one presented.

But I think this interesting problem need not be solved for Mr. Justice Taylor has not found it necessary to consider this questionable testimony by respondent and I, on the other hand, think that accepting it, at the value which I think it merits, together with the other evidence in the case (all of which I shall not endeavor to review), the entirety is insufficient to convince a Court of equity that there was such a contract, clear and explicit, and that it would be a fraud upon respondent for equity to now decline to enforce her claim.

As already indicated, there are numerous pertinent precedents, in the prior decisions of this Court, the authority of which I find substantially in line with the general rules governing such litigations which have been established by the Courts of our sister States, as is shown by reference to the annotations cited above, and some of which rules have been stated hereinabove.

By the clear decision in *White v. McKnight* (opinion by Mr. Justice Cothran), 146 S. C., 59, 143 S. E., 552, 59 A. L. R., 1297, it was established beyond doubt that a will made without reference to a contract to devise in accord with its terms is not competent evidence of a parol contract thereabout. The decedent in this case had such a will prepared in Rocky Mount but the attorneys who served him there testified that they had no recollection of his reference to a contract, and one of them said on cross examination that "it is rather unusual for any party to have a contract in connection with the preparation of a will," implying that such in this case would have probably impressed itself upon his memory.

The will, as has been said, contained no hint of a contract. It clearly evidences that at the time of making, respondent was the favorite object of testa-

tor's bounty which she was not when his subsequent will was made about three years later, soon after she had married and subsequently left his home and after antagonisms had arisen between her and his other near relatives. (But he did not forget her; in addition to a nominal legacy, he recounted that he had theretofore made to her "very liberal advances and gifts.") This will of 1936 was perfectly consistent with there being no contract and I think it was error (under *White v. McKnight, supra*) to consider it evidence of the alleged parol contract, as the master did upon the authority of cases decided in other jurisdictions. Indeed, I think the facts that the will contained no reference to any contract and that a will of contrary provisions was later executed, raise the inference, under the circumstances of this case, that there was no contract, no intention of the testator to be irrevocably bound by his first will. Without such intent there was no contract. 106 A. L. R., 766.

In substantiation of the foregoing the following apt quotation is from the opinion of Mr. Justice Woods in *Wilson v. Gordon,* 73 S. C., 155, 53 S. E., 79, which was quoted with approval in the subsequent case of *Dicks v. Cassels,* 100 S. C., 341, 84 S. E., 878, 879: "The fact that there was an absolute devise from each sister to the other without limitation was strong evidence that there was no intention to limit the power of alienation. When an intention is reduced to writing either in form of a will or contract, there is always a strong implication of fact that the whole intention has been expressed, and an implication still stronger that there is no agreement or intention contrary to that expressed."

The opinion in the latter cited case, *Dicks v. Cassels,* was by Mr. Justice Watts, afterward Chief Justice and famous for his natural keen and accurate insight into human nature and conduct, sharpened no doubt by his years of experience as a trial Judge. In denying the sufficiency of the evidence

there of a contract to devise, he said: "To establish an agreement such as is claimed by the plaintiff here, the proof must be definite, certain, clear, and convincing. A person has a right ordinarily to leave his property to whom he pleases. He has a right any time to make a will disposing of his property, and later on he can revoke this will *in toto* or change or modify the same by new will or codicil. It is a fixed principle of law that a will is revocable whenever the maker desires to change. A person has the right to dispose of his property as he pleases. He can show gratitude, affection, or charity, or he can be capricious with his own. The law gives to every one the right to enjoy his property while alive, and to make disposition of it after death. The maker of the will is dead, and the degree of proof establishing a contract whereby a will is made that cannot be revoked by the maker ought to be clear and convincing, certain and definite, and scrutinized and received with the greatest of care; for it practically deprives the owner of property of any interest in the property except to enjoy it for life. It is a most serious thing for the court to decide that a person cannot dispose of what is his by deed or devise, and because at one time he intended a certain person to be the beneficiary under his will and after his death to have his property and later that he cannot change his mind and substitute another or others. As persons advance in life they change their views as to a number of things, and it frequently happens that a wealth of affection and favors have been wasted on persons, and the recipient of the favors proves weak, unresponsive, unworthy, or ungrateful."

In *McKeegan v. O'Neill*, 22 S. C., 454, it is stated in the circuit decree, which was affirmed by this Court, quoting from Waterman, Spec. Perf.: "According to this authority the relief, when the alleged promise is to make a will, is confined to the first class of contracts: Legal contracts— where the minds of the contracting parties meet upon the

same terms : 'where there is an *intentional offer* on one side, and an *intentional acceptance on the other*'—deliberately entered into by the decedent."

In the latter case specific performance was denied despite a writing which was contended to be evidence of a contract to devise, and this Court said : "For one to be bound to dispose of his property in a certain way by will, the agreement or contract requiring him to do so must be established by the most satisfactory proof and after the strictest and most thorough examination of all circumstances attending it; or, as we said by Chancellor DeSaussure in *Rivers v. Ex'rs of Rivers* [3 DeSaus., 190, 4 Am. Dec., 609], "To be sure, the court would be more strict in examining into the nature and circumstances of such agreements than any others, and would require very satisfactory proof of the fairness and justness of the transaction.' "

It is interesting to note that Mr. Justice Watts again spoke for the Court in *Kerr v. Kennedy*, 105 S. C., 496, 90 S. E., 177, 179, wherein the Circuit Court judgment was reversed and specific performance denied, and said :

"It is an ancient and boasted right that a person has a right to dispose of, by deed or will, what is lawfully his own, and a person who undertakes to set aside a will, in every way properly executed by a competent person, on the ground that a contract had been previously made, must establish his own contention by clear, definite, and convincing evidence. They, plaintiffs, have failed to do this in this case.

"A contract to make a will, like other contracts, is irrevocable. The minds of the parties must meet. The testatrix must understand she is not merely promising to do something in the future, but doing it now; that she is relinquishing her right to change her mind."

Yet again it was Mr. Justice Watts who wrote the formal opinion of the Court in *Groce v. Groce,* 131 S. C., 416, 127

S. E., 719, 720, whereby the circuit decree was adopted, in which it was said: "After carefully considering the evidence reported by the master, I find that the plaintiff has failed to establish the contract with his mother, Mrs. Lucretia Groce, alleged in the complaint. The evidence shows that she for a number of years intended to leave him by will the property in question, in consideration of his living with her and caring for her as a son; but it does not show any agreement, contract, or legal obligation on her part to do so. See *Dicks v. Cassels,* 100 S. C., 341, 84 S. E., 878; *Kerr v. Kennedy,* 105 S. C., 496, 500, 505, 90 S. E., 177."

Finally, it is noted that Mr. Justice Watts wrote the leading opinion, and therefore the decision, of the Court in *Brown v. Golightly,* 106, S. C., 519, 91 S. E., 869, 872, Ann. Cas., 1918-A, 1185, in which concurrent finding of the master (relating to the alleged contract to devise) and the able trial Judge, Mendel Smith, were reversed (the procedure which I think should be followed in this case) and the alleged parol contract, which had been upheld by master and Judge, was held unenforceable in equity. It was pointed out, under the cited authority of *Dicks v. Cassels* and *Kerr v. Kennedy, supra,* that, in order to enforce specific performance in cases of this character, the contract must be reasonably clear, definite and certain and established by strong, clear and convincing evidence, which requirements the plaintiff in that case had failed to establish, despite the contrary, concurrent findings of master and Judge. The able Justice Hydrick concurred in the opinion of the majority of the Court, for whom Justice Watts was the spokesman, upon the ground that the evidence failed to establish the alleged agreement, quoting "by that measure of proof required by law in such cases. It is not sufficiently clear, definite, and certain." And he emphasized that the disinterested witnesses who testified as to the declarations of the deceased differed in the details of the declarations of the de-

cedent with respect to his intention, and said: "He (the decedent) may have merely expressed his intention to provide for the child in his will." Thus the situation of that case, as here summarized, bears very striking similarity to the case in hand.

I have not referred to all of the South Carolina cases which I have read relating to the subject but surely to enough to demonstrate the high degree of proof required for the enforcement in equity of such a contract as is here alleged, and I think the cases cited constitute undeniable and binding authority for the sustention of the present appeal, in the light of the record before us.

All of respondent's testimony is rendered unreliable, in my view, because of her statements concerning her former life and occupation in New York before she came to live with the deceased. Her testimony in that connection was literally annihilated by the appellants' evidence taken there *de bene esse* and also by other testimony, to all of which she made no effort to reply, not even taking the stand after the extremely damaging evidence of appellants was in. And some of these witnesses whom she failed to contradict were entirely disinterested in the outcome of the litigation.

It should be mentioned that respondent's own son and her estranged husband, who were likewise disinterested in the result of the suit testified against her; and the husband on cross-examination characterized her as the "meanest negro woman I ever had anything to do with," saying further: "She is the meanest and I am scared of her." And he spoke from experience for by that time he had had three wives. Incidentally, this husband of respondent, and from whom she derived her fourth name, is a railroad fireman earning over $300.00 per month and he testified, without contradiction, that she exacted about the last penny from him.

It was found, undoubtedly correctly, that decedent suffered a stroke in 1936 and such is stated as an unquestioned fact in the opinion of Mr Justice Taylor. But respondent said not, and stuck to it; she said he was "sick slightly from his ears, hard of hearing"; and that the doctors "announced his blood pressure a little high." (She dismissed his family physician shortly after his return from hospital.) It is a fair inference that this untruth was inspired by the allegations (unproved in their entirety) of the answer to the effect that testator at time of his first will had had paralysis and was feeble in body and mind and subject to her fraudulent influence and acts.

But how can one who regarded so lightly her oath as a witness be believed as to other matters, and sufficiently to invoke the aid of equity to wield a delicate and important power in her behalf?

The necessary conclusion upon the record is, I think, that respondent left her job and little earnings in a laundry in New York, where she lived without any family, and came to live with the testator, her bachelor brother, possibly at his solicitation, after his hospital experience. There she stayed for about three years and together they consumed his substantial income, that from his real estate rents alone being upwards of $200.00 per month. They purchased and enjoyed an automobile. She married and her husband lived in the home for a time and until together they moved away. After she left, the testator lived out his life (about another three years) with his mother (until her death) and another sister in his home. Shortly after respondent's departure testator consulted his lawyer, Mr. Levy, a highly respected member of the Sumter bar, and employed him to try to recover his money and furniture which respondent had taken away with her. $300.00 was paid in compromise settlement after respondent had complained to Mr. Levy that he should

not press the claim and that, in effect, what she had would be all that she would obtain from her brother.

On the contrary, if she had not been amply paid by the enjoyment of testator's home, automobile and income, her proper course would have been to file a claim against testator's estate for the unpaid value of her services. That she so contemplated is indicated by the testimony of another Sumter lawyer of high repute, Mr. Shore, who was consulted by her after testator's death concerning a possible claim, and he had no recollection of any statement by her relating to a contract.

It is passing strange to me that respondent never mentioned to Mr. Levy, despite the convenient opportunities afforded by their correspondence and personal interviews, that she had this all-important contract, as now contended, with her brother, Mr. Levy's client. Would it not have been the natural answer to the demand that she return the furniture? No Sumter witness (except Randolph Prince who is hereinafter mentioned) was produced who ever heard testator say that he had the contended arrangement with respondent, although his lawyer, doctor and other confidants testified. But respondent's feminine friends from Rocky Mount make him almost garrulous about it there. These considerations, I think, militate strongly against the probable verity of respondent's present claim. She knew the necessity of writing to make a will, and a power of attorney, for she procured the preparation of both for her brother. Is it not a logical inference that had there been a contract such as she now asserts, she would have seen to it that it was reduced to writing in Rocky Mount (as the will was) or in Sumter where the power was prepared? I think so.

Reverting to the testimony of the three colored women of Rocky Mount who testified for respondent concerning statements made there about seven years before by the decedent, in which the master placed full faith, it is interesting

to compare their evidence with that of the witnesses, Hewins, in *Erskine v. Erskine, supra.* The latter were entirely discredited by the Court because of the lapse of time and their profession of perfect memory of a conversation occurring years before concerning a matter in which they were not specially interested, all of which reasons exist equally or to a greater degree in this case, and I do not think that the important issue of this contest should turn upon their testimony which has so many of the earmarks of unreliability. As the Court said in the *Erskine case*: "The more reasonable view is that the two Hewins (here the Rocky Mount women—interpolated) from lapse of time and imperfect recollection as to the exact words used are mistaken in their testimony."

The three Rocky Mount witnesses referred to all differ in their versions of testator's intentions expressed to them there, they say, and none agrees with the contract alleged in the complaint or with respondent's statement of its terms on the witness stand. And likewise none jibes with the will which latter is a negation of a contract, although prepared in the presence of the claimed promisee. It seems to me patently impossible for the Court to undertake to find and enforce a parol contract so variously and conflictingly described by plaintiff's key witnesses. Of necessity, it is not clear, convincing and free from doubt. Certainly, such testimony cannot carry irresistible conviction of a contract and its terms. Yet this is a prime requisite for enforcement, and it is completely lacking in this case.

Moreover, decedent may have stated his intention to make a will at that time in favor of respondent, which he did, without saying, or intending to say, that he was obligating himself to an irrevocable contract whereby respondent would take the bulk of his large estate to the exclusion of his son, his other sisters and his brothers. The issue is too delicate and important to depend upon the frailty of untrained human

memories, particularly of these witnesses, in the face of the execution by testator of a will devoid of any reference to a contract or other impairment of its ordinary revocability. I think, as has been said, that the execution of a will of such terms and the subsequent revocation of it by another, contrary will, is evidence in this case of its non-contractual nature and that it was not intended by the maker to bind himself irrevocably to such disposition of his property at his death.

From the opinion of Mr. Justice Taylor it appears that he has been largely influenced to affirm the factual findings of the lower. Court by the testimony of the illiterate , witness, Randolph Prince, to which he several times refers. Prince served as testator's chauffeur to take him in his automobile to Darlington to see his mother after the latter had left her long-time haven in her son's (testator's) home where respondent then was. The witness testified that he overheard testator's statement to respondent that he was "going to move mother and Neeta back here, because I believe Neeta will take care of me better than you are." I quote the following, ensuing question and answer, for I think this bit of testimony, with the subsequent turn which examining counsel gave it, is of controlling importance in evaluating this testimony: "Q. And what did she say? A. She said, if you are going to do that how about my pay, and he said, Goldie, there will not be any changes made at all." Skillful examining counsel (the late Mr. L. D. Jennings) shortly thereafter substituted the word "agreement" for "pay" by the following quoted questions and answers: "Q. And you say Goldie asked about her services and the agreement they had made? A. Yes, sir. Q. Well, what did she ask about the agreement they made? A. She asked, what are you going to do about the agreement we made? He said there will not be any changes made." Thereafter the witness continued to refer to an agreement. Careful study of all of

the testimony of this witness convinces me that the case cannot, in keeping with the authorities, turn upon his evidence.

As before indicated, I have not undertaken to state all of the lengthy testimony. I repeat that a reading and rereading of it leaves me unconvinced of the truth of respondent's allegations, certainly to the degree of conviction necessary in such a case. Perhaps if it were an ordinary equity appeal from concurrent factual findings of master and judge, and uninfluenced by errors of law, my view would be different and I could conscientiously agree to application of the rule of *Alderman v. Alderman, supra.*

But this is very clearly not such a case, and my considered judgment is that the decree of the Circuit Court should be reversed and the complaint dismissed.

The majority having concurred in the foregoing, it is the judgment of the court, and the judgment of the Circuit Court is reversed.

MESSRS. ASSOCIATE JUSTICES FISHBURNE and OXNER concur.

MR. ASSOCIATE JUSTICE TAYLOR (dissenting).

This case comes by way of appeal from Sumter County where action was brought by the respondent for equitable relief to enforce the performance of an agreement, which she claims to have entered into with one Elliott-Johnson, now deceased, whereby the respondent was to live with and take care of the said Elliott Johnson and his mother in consideration whereof he was to give her at the time of his death, under his last will and testament, practically all of his property. Elliott Johnson died on July 10, 1942, and there was admitted to probate in common form by the Judge of Probate for Sumter County, South Carolina, shortly after his death, a paper purporting to be his last will and testament, and bearing date March 6, 1939. On August 4,

1942, this suit was commenced for the purpose of declaring a will of Elliott Johnson, dated August 24, 1936, as his last will and testament under a contract made with the respondent by the testator, and for the purpose of declaring the will of March 6, 1939 to be in violation of such agreement with the respondent.

After issues were joined the case was referred to the now lamented, the Honorable H. C. Haynsworth, Master in Equity for Sumter County, and after taking a mass of testimony, he wrote a very able and comprehensive report in which he, in effect, sustained the claim of the respondent. On exceptions to the Master's report, Honorable P. H. Stoll, resident Judge of the Third Circuit, after going into the matter thoroughly, which fact is stressed in his decree, overruled all of the exceptions and confirmed the Master's report.

The appellants have taken nine exceptions to the decree of the Circuit Judge, but in their printed argument state the "Questions Involved" to be:

"I. Did the testator make with plaintiff the contract alleged in the Complaint? (Exceptions 1, 2, 3 and 4.)

"II. Did the trial Judge err in holding that the alleged contract was put into effect by the making by the testator of a will in favor of plaintiff and that such will was proof of the terms of the alleged contract? (Exception 6.)

"III. If the alleged contract was made by the testator was it breached by plaintiff? (Exceptions 5, 7 and 8.)

"IV. Did the trial Judge err in holding that the alleged contract having been made, the testator breached the same, and that if it was breached by plaintiff the testator condoned such breach? (Exception 9.)"

The respondent, in her printed brief, has also stated the "Questions Involved" from her standpoint, but in our opinion the questions necessary to a decision of this case may be condensed and are as follows: 1. Is there competent and

substantial evidence in the record to support the finding of fact by the Master in Equity, concurred in by the Circuit Judge, (a) that Elliott Johnson, the testator, entered into an agreement with the respondent to make a will whereby and wherein the respondent was to be the main beneficiary, and (b) that the respondent performed her part of the contract? 2. Upon the performance of the contract by the respondent, did her rights under the contract become vested? 3. Was the making and execution of the 1936 will, whereby the respondent was made the chief beneficiary, in the light of the other testimony, any evidence of the alleged agreement between Elliott Johnson and the respondent? 4. Can a party to a suit testify to a conversation between the deceased and a third person not a party to the suit?

This Court held in the case of *Dicks v. Cassels,* 100 S. C., 341, 84 S. E., 878, and in many other cases, that to show a contract by parol, similar to the one which the respondent has sought to prove in this case, it is necessary that such contract be established by clear, cogent, and convincing evidence which carries irresistible conviction to the mind, that such a contract was made as claimed by the respondent. This is unquestionably a very sound principle of law and we shall adhere to it in deciding the questions involved in this case.

Attention is directed to the comparatively recent case of *Baylor et al. v. Bath et al.,* 189 S. C., 269, 1 S. E. (2d), 139, a suit to enforce the performance of an alleged oral contract to make a will. The printed brief of appellants in that case cited the case of *Dicks v. Cassels, supra.* While the cited case was not referred to by name in either the report of the Special Referee (who occupied the same status as a Master in Equity) or the opinion of the Court, no doubt the Court gave full effect to the principle of law established by the *Dicks-Cassels case.*

That the Master in Equity and the Circuit Judge gave due consideration to this principle of law is evidenced by

the citation of the *Dicks-Cassels case* in the report of the Master, and the order. of the Circuit Judge confirming and adopting the report of the Master, wherein it is stated : "Under the rule laid down in the case of *Erskine v. Erskine,* 107 S. C., 233, 92 S. E., 465 (following the rule in *Dicks v. Cassels*), I have scrutinized the testimony in this case with great care, and I concur with the Master in his findings that the terms of the contract or agreement by Elliott Johnson, deceased, to make a Will in favor of the Plaintiff herein, are definite and certain, and are established by clear and. convincing evidence."

In *Wilson v. Gordon,* 73 S. C., 155, 159, 53 S. E., 79, 81, it is stated : "A contract to make a certain disposition of property by will is as valid as any other contract; citing 3 Pomeroy's Equity Jurisprudence, § 1244. Chief Justice Simpson, in discussing such contracts, says, in *McKeegan v. O'Neill,* 22 S. C. [454], 455, 467 : 'Agreements may be divided into two classes, distinguished by the mode in which they are made. (1) The ordinary agreement, where an intentional offer is made on the one side founded upon a sufficient consideration, and an intentional acceptance on the other, resulting in the meeting of minds upon the same terms. (2) "Where it is created by representations made by one party and acts done by the other upon the faith of such representations. Where an absolute, unconditional representation of something to be done in the future is made by one person in order to accomplish a particular purpose, and the person to whom it is made, relying upon it, does the act by which the intended result is obtained and purpose accomplished, a contract is thereby concluded between the parties." ' "

It is contended by the appellants that since the respondent is a party to the action and an interested witness, her testimony as to Elliott Johnson's statement to the attorneys in Rocky Mount, North Carolina, when they were preparing

to draw the will, is inadmissible under the provisions of Section 692 of the 1942 Code. Section 692 does not bar testimony of a party to the action as to communications between the deceased and third persons, but only communications between the party to the action and the deceased. This interpretation of this section has been established by many decisions of this Court. Some are: *Hughey v. Eichelberger,* 11 S. C., 36; *McLaurin v. Wilson,* 16 S. C., 402; *Colvin v. Phillips,* 25 S. C., 228; *Roe v. Harrison,* 9 S. C., 279. The Master, in admitting the testimony of the respondent as to the conversation between Elliott Johnson and his attorneys, relied upon the rule laid down in the above cases and ably and concisely gave as his reasons for so doing as follows: "Section 692 is an exception to the fundamental right given by statute, as well as by common law, to every litigant to testify in his own behalf. This rule is general; the exception is particular. The language of the particular exception to the general rule must be strictly construed. * * * The excepting statute does not bar the litigant from testifying to communication between the deceased and third person."

Appellants cite the case of *Merck v. Merck,* 89 S. C., 347, 71 S. E., 969, Ann. Cas., 1913-A, 937, and contend that the principle therein announced makes the testimony of the respondent regarding the conversation between the deceased and his Rocky Mount attorneys inadmissible. There is a distinction between the *Merck case* and this case. The *Merck case* is authority for the principle that one who has witnessed the execution of a deed and thereafter becomes the owner of the property conveyed by that deed cannot testify thereafter, in a suit in which he is a party, that he saw the grantor sign the deed when at the time he attempts to testify, such grantor is dead. The Court specifically stated that the witness who was a *party to that transaction* was disqualified from testifying. Nowhere in the decision is it

stated that a party in interest cannot testify to a conversation which he heard between the deceased and a third party. The respondent was not a party to the transaction, but simply heard the conversation between the deceased and his attorneys. Even though she might have been interested in that conversation, her interest does not make her testimony incompetent under Section 692.

This Court has held on numerous occasions that where issues of fact in an equity case are found by the Master and concurred in by the Circuit Judge, that such factual findings will not be disturbed unless such findings are without evidence to support them or are against the clear preponderance of the evidence. In the case of *Alderman v. Alderman,* 178 S. C., 9, 181 S. E., 897, 105 A. L. R., 102, it is stated: "It is a fixed rule that this Court will not disturb concurrent factual findings of the Master and Trial Judge in an equity case unless such findings are without evidence to support them or are against the clear preponderance of the evidence."

To cite other cases on the subject would serve no useful purpose. This principle of law is recognized in South Carolina as a cornerstone in equitable jurisprudence.

Elliott Johnson was a negro possessed of considerably more than average intelligence. He was employed for many years by the Atlantic Coast Line Railroad Company and accumulated property of value, consisting of a number of tenant houses and some personalty. He never married. In the Spring of 1936 he had a stroke and was an invalid or a semi-invalid for the rest of his life. He spent considerable time in Railroad Hospitals in Rocky Mount, North Carolina, and Waycross, Georgia. In March, 1936, the respondent, a sister of Elliott Johnson, moved to the home of Elliott in Sumter, South Carolina, upon the invitation of Elliott; she was engaged in profitable employment in New York City prior to this time.

When Elliott Johnson and the respondent were in Rocky Mount, N. C., in June, 1936, a power of attorney was executed by Elliott, which bears date June 29, 1936, under which power of attorney there was turned over to respondent the handling of his entire business. While in Rocky Mount and when Elliott was in conversation with his attorneys who prepared the will of August 24, 1936, the respondent testified that she heard Elliott tell his lawyers that his sister, the respondent, and he had entered into an agreement whereby it was understood that if she would give up her work in New York and make Sumter her home and live with him as a housekeeper, and take care of his mother and himself the rest of their lives, and take care of his property and his business, that he would leave the respondent all of his property, except two insurance policies; that respondent was carrying out her agreement; and that he wanted to make a will as a part of the contract. Norine Bailey, a Notary Public of North Carolina, stated in substance that Elliott Johnson came to her and said that he wanted a will drawn, and she told him that she was not qualified to prepare a will, and directed him to Thorpe & Thorpe, Attorneys, in Rocky Mount, North Carolina. Elliott told this witness that he wanted a will drawn giving the respondent the larger portion of his property for taking care of him and looking after him, and that the respondent had given up her work in New York and came and lived in his home for such purposes; and that she was the only one who would come and take care of him and live with him, and he did not know what he would do if it were not for her. Ruby McNair in substance testified that she lived in Rocky Mount, North Carolina, and that Elliott Johnson had told her in the presence of her parents that he was going to give the respondent all he had for taking care of him, and that he had fixed it so in his will that she would get it. Mamie McNair in substance testified that Elliott

Johnson told her that the respondent had come from New York to take care of him and his mother; that he had asked her to give up her business in New York and come to his home to take care of him, which she had done; that he was going to give her all of his property and that he wanted her to have everything that he had. Elliott stated further to this witness that the respondent had agreed to his proposition and that he had agreed to give her all of his property. Another witness, Randolph Prince, testified that he was present and heard Elliott tell the respondent that he wanted her to leave, and that in spite of her leaving there would not be any changes made in the agreement.

It does not seem reasonable that a person of the respondent's intelligence would have given up her independence and undertaken the difficult and exacting task of looking after an invalid brother and his business without some understanding about compensation. There is no evidence that she was paid a salary, even though it is admitted that she lived with her brother for almost three years. While it is true that there might have been some sisterly affection which might have played some part in persuading the respondent to come to South Carolina and live with and take care of her sick brother, yet we do not think that she would have done so, or that the average person would have undertaken the task which was before her without some agreement that she would in some way be paid for her services.

We have read and studied the record in this case and there is an abundance of evidence to support the Master and Circuit Judge in their concurrent factual findings that there actually was an agreement between the respondent and Elliott Johnson, with the covenants and conditions substantially as alleged in the complaint, and this is true without the testimony of the respondent.

Having held that there was a contract, our next inquiry is: Was it put into effect when Elliot Johnson made his will

on August 24, 1936, and if such will was any evidence of the contract? In the light of the testimony we think that the will is in effect a consummation of the agreement between the parties, and actually gives life to the contract. An instrument of such vital importance in a case of this kind cannot be ignored, and we think that is of primary importance in the case. It is true that it is not sufficient in and of itself to prove the agreement relied upon by the respondent, but it certainly is entitled to consideration in recognition of the agreement. The case of *Wilson v. Gordon, supra,* relied upon by appellants, does not hold that no consideration should be given to a will which is drawn in pursuance of an agreement between parties whereby the testator agreed for a good and valuable consideration to leave his property to another person. In that case the Court held that there was no evidence of a contract. The only evidence relied upon was the will itself, which contained no reference to an agreement, and the Court properly held that the plaintiff was not entitled to the relief asked for since she failed to prove the contract.

We have seen that an agreement was reached between Elliott and his sister, under which he on the one part was to make a will giving her most of his property, and she on her part was to take care of him and his mother. The agreement is corroborated by two outstanding facts, *i. e.,* (1) the respondent entered upon the performance of her duties, and (2) Elliott made the will and delivered it to the respondent. Our Courts have held that a contract of this character is irrevocable, but this does not mean that the contract cannot be abrogated by mutual consent, or if breached by one party, such breach condoned or acquiesced in by the other. In the case of *Bruce v. Moon,* 57 S. C., 60, 35 S. E., 415, 418, it is stated: "Both upon principle and authority we have no doubt that A. H. Moon could not defeat the testamentary provision made for the plaintiff in

his will by the conveyance. To allow A. H. Moon, after having received and enjoyed the consideration upon which he promised to give his property, at his death, to the plaintiff, and after having, in recognition of such promise, actually executed his will to that effect, to defeat such testamentary provision by this conveyance to his son would be a palpable fraud on the plaintiff, which a court of equity should not and will not tolerate."

The question now arises: Was the contract breached by respondent? There is ample evidence that the respondent performed her part of the contract by living with her brother and taking care of him for almost three years and of his (their) mother until she left to live with a daughter, and that she (respondent) only left his home when she was required to do so. The witness, Randolph Prince, stated that he heard Elliott Johnson say to his sister, the respondent, that if she did not leave his home he would get the police to come to his assistance and force her to leave. The witness further stated that when respondent asked Elliott what was going to be done about the agreement, Elliott said: "There will not be any changes made at all." If the contract was broken, therefore, Elliott Johnson and not the respondent is responsible; and she should not be required to forfeit her rights under the contract and thereby suffer a loss on account of his acts and conduct. To require her to do so would not be equity.

The respondent performed her part of the contract for almost three years. His other sisters, who lived in Darlington, and some of his friends apparently induced him to get rid of the respondent. There is no evidence that she consented to herself being discharged. The only competent witness, who testified on the subject, was Randolph Prince. He stated that he heard Elliott say to his sister that she would have to leave his home, and when she demurred, he threatened to call the police; and at the time she asked

him about the agreement and he said that no change would be made. It seems that it would be far fetched to hold or even claim that the respondent under such circumstances voluntarily surrendered her vested rights because she left the testator's home rather than to submit to physical eject-ment by the police. It is true that the respondent's settlement with Mr. Levy, the testator's attorney, concerning money in hand belonging to Elliott, some time after she left Elliott's home, might be slight evidence of her relinquishment of her rights under the contract; but it is no evidence that the respondent knew of her rights under the agreement with Elliott and that she knowingly and voluntarily relinquished such rights. Despite this transaction the evidence is more than sufficient to sustain the Master and Circuit Judge on this question.

In the Master's report of this case, under the sub-heading "Impressions Made by Witnesses", we have been given a most interesting and graphic word-picture of the key witnesses in this case. He was one of wide exper-ience in weighing testimony, therefore this portion of the Master's report, beginning on page 481 of the Tran-script of Record and continuing to the top of page 488, down to the sub-heading "Conclusions of Law" will be re-ported with this opinion. The writer of this opinion is tempted to also direct the reporting of other portions of the Master's report, especially his summation of the testi-mony of the witnesses, but will not do so.

For the above stated reasons, it is my opinion that the judgment of the Court of Common Pleas should be af-firmed.

'Mr. Chief Justice Baker (concurring in dissenting opinion) :

I concur in the opinion of Mr. Justice Taylor.

The late and lamented H. C. Haynsworth, Master in Equity, saw the witnesses and observed their demeanor on

the witness stand, and was convinced from the voluminous testimony taken before him that the decedent entered into the contract with the plaintiff (Respondent) practically as alleged in her complaint. And I feel sure that the said Master was fully cognizant of the governing law in this class of cases, that is, the measure of proof required to establish a parol contract to make a Will, for he cites in his Report the leading cases in this State which govern the quality and measure of proof required in cases of this character. In fact, with the able counsel appearing in this case, he would not have been permitted to overlook the governing law. The Report of the Master (48 printed pages in the Record) reflects his study and understanding of both the established law applicable, and of the testimony.

In confirming the Report of the Master, the learned Circuit Judge, Honorable Philip H. Stoll, emphasized the fact that he had studied the record, and certainly in the light of the citation by him of the case of *Erskine v. Erskine,* 107 S. C., 233, 92 S. E., 465, which paragraph from his Decree is quoted in the opinion of Mr. Justice Taylor, it cannot be successfully contended that Judge Stoll was not fully aware of the measure of proof necessary to establish respondent's case.

Of course where the Master and Circuit Judge reach a conclusion based upon a misconception of the applicable law, then it amounts to an error of law, and this Court will not hesitate to make a finding contrary to that of the Master and Circuit Judge, but where the findings of fact by the Master concurred in by the Circuit Judge are not based upon a misapprehension of the law, and there is ample testimony to sustain their findings, as in this case, it is the established law in this State that their findings of fact will not be disturbed.

I cannot agree with Mr. Justice Stukes that the case of *White v. McKnight,* 146 S. C., 59, 143 S. E., 552, 553, 59

A. L. R., 1297, holds that a Will made without reference to a contract to devise is not competent evidence in a case of this character.

In that case the plaintiff was suing for damages on account of the alleged breach of a contract entered into between the deceased ·testator and the plaintiff to devise to the plaintiff a certain tract of land. It was admitted that after the alleged contract was entered into the testator conveyed the tract of land in question to a third party, who had no notice of the contract. Since an action for specific performance of the alleged contract could not be maintained, the suit ·for damages for the breach of the contract was instituted. Parol evidence relating to the contract was inadmissible under the Statute of Frauds, and evidence of part performance of the contract was inadmissible because the action was not one for specific performance on the equity side of the Court. The plaintiff attempted to offer the Will in evidence and claimed that it was a writing relating to the contract which made it admissible in the face of the provisions of the Statute of Frauds. It was properly held that the Will in and of itself was not a "sufficient" memorandum of the agreement. On numerous occasions throughout the opinion stress is laid upon the fact that it was a law action and not an action to enforce the specific performance of a contract.

In the very beginning of the opinion the following language is used: "* * * It needs to be emphasized at the outset that it is not an action for the specific performance of a contract to devise, an action cognizable in equity, but an action for damages for the breach of such contract, an action, strictly cognizable at law."

And in the opinion it is stated:

"But it is one thing to enforce this rule and an entirely different thing to permit a recovery of damages for the breach of a parol contract obnoxious to the statute. The

one is based upon an implied contract; the other upon an express. * * *"

"It thus appearing that it is impossible to maintain an action at law for damages on account of the breach of a parol contract obnoxious to the statute, by virtue of alleged part performance of the contract, the evidence tending to establish the claim of the plaintiff to such part performance becomes entirely negligible; * * *."

The plaintiff sought to prove the agreement and take the case out of the Statute of Frauds by introducing in evidence the Will when there was no part of the agreement set forth in the Will. It is apparent, therefore, that the Will was no evidence tending to show that the alleged contract was in writing; consequently, that instrument being the only written evidence offered to take the case out of the Statute of Frauds, it was manifestly insufficient to prove the alleged contract when there was no reference made to the contract in the Will.

We have an entirely different situation in this case. This suit is unquestionably to enforce the performance of an agreement cognizable in a Court of equity, and any evidence whether it be by parol or in writing is admissible; and even if the parol evidence is obnoxious to the Statute of Frauds in a law case, it would be admissible as proof of the alleged contract.

The case of *Brown v. Golightly,* 106 S. C., 519, 91 S. E., 869, Ann. Cas., 1918-A, 1185, referred to at length in the opinion of Mr. Justice Stukes has, while not specifically by name, been overruled time and again, and is no authority. I have grave doubt that there was a concurrent finding of fact by the Master and the Circuit Judge relating even to the alleged contract to devise. Certainly there wasn't as to part performance of the contract.

If the opinion of MR. JUSTICE STUKES becomes the prevailing opinion, then this class of cases will be practically outlawed in this State.