## 19476

Helen C. CORONTZES, Respondent, v. Andrew A. TRAPALIS et al., Appellants

(191 S. E. (2d) 523)

*Messrs. William C. Helms, III*, of *Barnwell, Whaley, Stevenson, & Patterson, David S. Goldberg*, and *A. Arthur Rosenblum*, Charleston, *for Appellant's*,

*Thomas S. Tisdale, Jr., Esq.*, of *Young, Clement & Rivers*, Charleston, *for Respondent*,

*Messrs. William C. Helms, III*, of *Barnwell, Whaley, Stevenson, & Patterson, David S. Goldberg*, and *A. Arthur Rosenblum*, Charleston *for Appellants*, in Reply

August 29, 1972.

BRAILSFORD, Justice:

I am convinced that the evidence in this case fails to meet the strict standard of proof required to establish an oral contract to make a will.

Plaintiff's reliance is principally upon the testimony of her husband as to statements made to him by her uncle over a period of years. These statements abundantly establish the love and affection which existed between uncle and niece, her devoted service to him and his ailing wife, his gratitude and intention to reward her by leaving substantially all of his property to her upon his death. However, with perhaps one exception, these conversations had little, if any, tendency to establish that the uncle was contractually obligated to his niece.

The testimony of the only other witnesses on the point strongly corroborates the husband's testimony as to the warm relationship between uncle and niece and his testamentary intention toward her, but has no tendency to establish a contractural obligation.

The exception referred to is the husband's testimony as to a conversation between the uncle and niece, which is quoted in the opinion by the Chief Justice, in which he expressed a desire to leave certain real property to her two brothers, to which she assented. While it may be inferred from this testimony that the uncle acknowledged a contractual obligation to devise his property to his niece, it must be remembered that the testimony came from a naturally biased witness, who did not undertake to quote the conversation, merely giving his impression of its substance and effect.

The opinion of the Chief Justice relies heavily upon the rule prevailing in some jursidictions that under appropriate circumstances the execution of a conforming will, although invalid, is regarded as corroborative of other evidence that a contract to make the will existed.

This was also emphasized in the circuit court where the special master expressly held that but for the uncle's attempt to execute a conforming will, the evidence would be adjudged insufficient to establish a contractual obligation to his niece. Apparently overlooked by counsel and the court was the rule prevailing in this State that an attempted will which makes no reference to a contract to devise is not competent evidence of the existence of such a contract. *Young v. Levy,* 206 S. C. 1, 32 S. E. (2d) 889, 895 (1945).

But even if we should adopt the rule followed elsewhere on this point, reliance upon it would be misplaced under the facts of this case. The will was not executed until nearly twenty years after the uncle allegedly had become contractually obligated to devise his estate to his niece. It seems farfetched to attribute the attempt to make a will in 1966 to an obligation incurred by the uncle in 1947 when his niece responded to his invitation to move into his Charleston home. Furthermore, the promise which the niece attempted to establish was the devise of all of the uncle's property to her. The record shows that upon his death, within a few weeks after signing the purported will, the uncle had bank accounts and accounts in savings and loan institutions totaling $25,872.33 and other personal property. Yet, he did not attempt to dispose of any of this considerable portion of his estate to her. Even if the purported will had been properly executed, his personal estate, with the exception of two bequests of $1,000.00 each to a church in Charleston and one in Greece, would have passed as intestate property. Clearly, the terms of the attempted will did not conform to the claimed contract.

I must conclude on the whole case, that, as in *Caulder v. Knox,* 251 S. C. 337, 162 S. E. (2d) 262 (1968), "the proof in this case is not clear, cogent and convincing, nor does it compel conviction that the contract was actually made." 251 S. C. at 347, 162 S. E. (2d) at 267.

The foregoing opinion having been concurred in by a majority becomes the judgment of the Court.

Reversed and remanded.

Bussey and Littlejohn, JJ., concur.

Moss, C. J., and Lewis, J., dissent.

Moss, Chief Justice (dissenting).

Heretofore I prepared an opinion affirming the judgment of the lower court. A majority of the Court has taken the opposite view; that opinion is herewith filed as my dissent.

Helen C. Corontzes, the respondent herein, brought this equitable action for specific performance of an alleged oral contract to make a will, which she entered into with her uncle George J. Carabatsos, now deceased.

The respondent, in her complaint, alleges that George Carabatsos and his wife, Stavroula G. Carabatsos, offered to her and her family that if she would come to the United States and care for them, that they would provide for her transportation and take her into their home, make her the object of their bounty and treat her, their niece, in all respects as if she were their lawful daughter, specifically agreeing to devise to her by his last will and testament, certain of the land and all monies owned by him at the time of his death.

The respondent further alleged that she fully complied with the alleged oral contract and that George J. Carabatsos made an effort to fulfill his alleged obligation by attempting to execute a testamentary instrument in which he left certain of his real estate and all of his money, with the exception of two specific bequests of $1,000 each to two churches, to the respondent. The aforesaid instrument was allegedly in the handwriting of George J. Carabatsos but was without proper attestation and therefore could not be admitted to probate.

The appellants herein, who were the heirs and distributees of George J. Carabatsos, by their answer, denied the existence of the alleged oral contract which the respondent seeks to enforce

This case was, by proper order, referred to Augustine T. Smythe, as Special Master, to take the testimony and report his findings of fact and conclusions of law to the Court of

Common Pleas for Charleston County. The case came on for a full hearing before the said Special Master and he thereafter on December 18, 1970, filed his report sustaining the alleged contract to devise and recommended that specific performance thereof be ordered by the court. Upon exceptions to the Report, the Circuit Court, by a decree dated September 25, 1971, sustained the Report of the Special Master and made the recommendations therein contained a part of the decree. Timely notice of intention to appeal to this Court was given by appellants.

The sole question presented by the exceptions of the appellants is: Did the evidence of the existence of the alleged contract to make a will meet the necessary degree of proof required to establish such a contract? The issue thus presented is primarily factual.

It is well settled that one can make an enforceable contract to dispose of his property by will. In such case equity requires that the contract possess all of the essential elements of a legal contract and may be either oral or written. *Caulder v. Knox,* 251 S. C. 337, 162 S. E. (2d) 262.

The burden of establishing the existence of the alleged contract and its terms rested upon the respondent. However, the usual rule of preponderance or greater weight of the evidence, applicable to civil actions generally, does not apply in actions to establish a parol contract to devise. It is not enough that such an agreement be proven by a mere preponderance of the evidence. Such contracts are regarded with suspicion and will not be sustained unless established by definite, clear, cogent and convincing evidence, a higher degree of proof than is necessary in the usual civil case. *Brown v. Graham,* 242 S. C. 491, 131 S. E. (2d) 421.

The intention of the parties should be determined from the surrounding circumstances, as well as from the testimony of all witnesses; and subsequent acts are relevant to show whether a contract was intended. *Caulder v. Knox, supra; Kerr v. Kennedy,* 105 S. C. 496, 90 S. E. 177.

Under Article V, Section 4, of the 1895 Constitution of this State, we have the authority and corresponding duty to review the findings of fact of the lower court. *Young v. Levy*, 206 S. C. 1, 32 S. E. (2d) 889.

The Master and the trial judge did not consider and excluded the testimony of the respondent under the Dead Man Statute, Section 26-402 of the Code. We consider the other evidence applying the rule above stated. The appellants offered no evidence in the trial of this case.

Arthur N. Corontzes, the husband of the respondent, was called as witness in her behalf. He testified that he had known George J. Carabatsos and his wife all of his life. He said he conferred with George J. Carabatsos about a year before his wife came to America and was told by him that he wanted to bring his niece to America and that in order to keep her here he wanted to arrange for her to marry an American citizen and he asked him to do this, to which he agreed. He stated that upon the arrival of the respondent in America in December of 1947, that they were married in a civil ceremony in Berkeley County, South Carolina, in keeping with the agreement previously made. He testified that Carabatsos told him that he wanted someone to be a companion to him and his wife in their old age "so that they could have someone with them like most people had children in a family, and they wanted someone close to them to help them and take care of them." This witness was then asked if Carabatsos indicated what he intended to do, to which he replied:

*  *  *  "He told me I had nothing to worry about, because he was bringing Helen to America to be his child in a sense, and that he wanted a companion, he and his wife needed someone to be with them and that everything—I needn't worry about her, that I had no responsibility towards her because he would take care of her, that everything he had was hers, everything he had would be hers."
*  *  *  and "that he would take care of her."

In answer to a question as to why Carabatsos wished to make Helen the object of his bounty he replied:

"He stated that he did not want her to be left alone, without anything, is the way he said it. He also said that he thought of her as a daughter, as his daughter, and he wanted her to have everything because of the fact that she was faith- and loyal to them. She did take care of them, she was interested and she did love them and stayed with them. Now this—he said this was the reason he brought her to America and this is what he appreciated in her doing for him, and he did not want, in any case, that anything would ever happen to her —to him that she would be left without anything."

This witness was asked the question "did Mr. Carabatsos ever state the reason for his agreements to leave his property to Helen?" to which he replied:

"Yes, he mentioned to me that Helen was one that was close to him and took care of him and that's why he wanted to leave her everything he had."

It appears that George J. Carabatsos and his wife, the respondent and her husband, were all of Greek decent. It was testified that Authur N. Corontzes and the respondent did not live together after they were married in the civil cere- mony and that such marriage was not recognized as being valid unless confirmed by a marriage in a Greek church. The evidence is that these parties were married in the Greek church in 1953 with the approval of George J. Carabatsos and his wife, who gave a wedding reception for them fol- lowing the church marriage. Immediately following their marriage in 1953, they moved to Atlanta, Georgia, where Arthur was employed as a librarian at Georgia School of Technology. They remained there until 1958 when they re- turned to Charleston, South Carolina, where Arthur became a librarian at The Citadel. There was testimony that after the respondent moved to Atlanta she returned to Charleston frequently to look after the needs and wants of her aunt and uncle, these visits usually lasted about a month.

This witness was asked the question, from 1953 to 1966, when he died, did George Carabatsos relate to you the reason for Helen's presence in this country. His answer was:

"Yes, this had been mentioned to me many times, even before 1953 like I said a little while ago. He mentioned many times that the reason he brought her to America was to have someone to take care of him and his wife in their old age, and he mentioned to me over and over again that as a result of her taking care of them, that he would leave everything for her—to her."

This witness testified that after he and his wife moved back to Charleston that they attended Mr. & Mrs. Carabatsos practically everyday and that his wife would go there and take care of them, to see that their home was in order and that they had food to eat. During such time, Mrs. Carabatsos was ill and died in September of 1961. He further testified that they saw Mr. Carabatsos everyday from the time Mrs. Carabatsos died until he died on June 10, 1966. He said his wife would go to the Carabatsos home to look out for him and to see that he was taken care of.

This witness testified that about two months before Mr. Carabatsos died:

"He was at our house one evening, it was after supper, he told Helen that he was—although he had, promised to leave her everything he had, that he would like to leave—he would like her permission to leave the house, the property on the corner of Ashely Avenue and Line Street to her two brothers. He says that he wanted them to have something so that they would not be a burden to her later on in life."

He further said that upon the foregoing statement being made, his wife told her uncle "she didn't have any objection to his doing that."

This witness also testified that Mr. Carabatsos delivered to his wife a small cigar box prior to his going to the hospital or during his hospitalization. She was told that if anything happened to him he wanted her to open the box. After his

death the box was opened and a document dated May 12, 1966, and written in the Greek language with a signature in Greek and English, was found. This writing was offered in evidence and the Greek was translated into English. The translation of the will from Greek to English was as follows:

"I, George John Carabatsos, born in Nassia, Calavrita, Greece of Christian Orthodox parents Named John George Carabatsos and Catherine John Carabatsos descendent of Panayotis Darras born in Nassia, Calavrita, draw my Will today the 12 of May, 1966.

"My small in my name estate I leave after my death to the following relatives of mine. First: the half-owned in partnership with my friend A. A. Trapalis,, Building 107 & 107½ Rutledge Ave; also two small apartments on 90 Bull St. I leave to my niece Helen A. Corontzes decendant of the deceased Constantine J. Carabatsos.          ,

"Second: the building located on 172 & 174 Line Street and also the second floor Apartment on 270-B Ashley Ave. I leave to my nephews John & Demetre sons of Constantine Carabatsos living in Nassia, Calavrita, Greece.

"If money are found in Banks in my name Power of Attorneys Arthur N. Corontzes & Helen A. Corontzes must give $1,000.00. to the church of Saint Demetrios in Nassia, Calavrita, in memory of Stavroulla, George & Andreas and $1,000.00 to the Holy Trinity Church for care of our grave: and Helen you always must remember your brothers John and Demetre.

    signed,

                      G. J. CARABATSOS.

May 12, 1966."

Dr. John Manos testified that he and his family lived in a downstairs apartment of the Carabatsos home from 1955 until October of 1960. He said that Mrs. Carabatsos had a very bad cardiac condition as well as an ulcer problem. She was essentially bed ridden. He said that he attended her in

her last illness. He testified that during her illness the respondent was present and cared for her in the terms of clothing her, preparing food, cleaning the house and spent many hours doing so. He said that Mr. Carabatsos "was completely satisfied with his niece and really, my impression is that his niece was really a daughter." He said that on a number of occasions he was left without any doubt in his mind that the respondent was going to. be the heir of George Carabatsos.

Nicholas Latto, who lives in Charleston, said that he had known Mr. Carabatsos ever since he was a young boy and that he knew the respondent as a young girl who came over from Greece. He described her relationship with Mr. Carabatsos as one of great love, devotion, and affection on the part of both.

The Master found, taking into account the direct evidence and all the surrounding circumstances, that the contract was made as alleged. He also found from the evidence that the respondent had performed her part of the contract. This conclusion was concurred in by the judge.

The will that George J. Carabatsos attempted to make, which was signed on May 12, 1966, was corroborative evidence tending to confirm the agreement between George J. Carabatsos and the respondent. The fact that he requested her permission to leave one parcel of real estate to her two brothers is indicative of the contract between the parties and of his intention to comply with his part of the agreement, even though he failed in his effort to do so by not having his attempted will properly attested.

In 57 Am. Jur., Wills, Section 187, P. 165, we find the following:

"Proof of a contract to devise property in consideration of services rendered may be found in a will executed by the promisor and containing a bequest in favor of the person who has rendered services for the testator. In fact, it is said that under such circumstances the instrument is strong

corroborative proof of the contract. This rule has been applied, notwithstanding the instrument, executed, although intended as such, was ineffectual as a will."

In 94 C. J. S. Wills § 113(2), p. 870, it is stated that:

"A will made in conformity with an alleged contract is strong confirmatory proof that such an agreement was entered into; where there is evidence tending to show the existence of a contract, the proof of the execution of a will in favor of the promisee is corroborative proof of the contract, even though the will is invalid, and even where the will is subsequently revoked, it is considered by the court as evidence in support of the agreement, * * *."

In support of this text, there is cited the case of *Tigglebeck v. Russell,* 187 Or. 554, 213 P. (2d) 156. The Oregon Supreme Court was considering a case in which the decedent had drawn a will leaving everything to the plaintiff in accordance with an alleged oral contract, but in which the will, as here, was invalid because of a lack of proper attestation. The Court said:

"The general rule is that, if there is evidence tending to show the existence of a contract, proof of the execution of a will containing a devise or bequest in favor of one who has performed services for the testator is corroborative proof of the contract. * * * And it is immaterial that the will is invalid because of lack of the required statutory number of witnesses. *Maddox v. Rowe, supra,* 23 Ga. 431, 68 Am. Dec. 535. See 57 Am. Jur., Wills, Section 187; Annotations 69 A. L. R. 202; 106 A. L. R. 765."

When there is evidence tending to show the existence of a contract to make a will, proof of the terms of a will in conformity with such contract is confirmatory proof that the agreement was made.

I have studied the testimony in this case with great care and concur with the Master and the Circuit Judge in their findings that George J. Carabatsos, now deceased, agreed to

make a will in favor of the respondent and such has been established by definite, clear, cogent and convincing evidence.

The exceptions of the appellant should be overruled and the judgment of the lower court affirmed.

Lewis, J., concurs.