17292

W. T. LOOPER, Respondent, v. MONTIE WHITAKER, IRIS W. MORRIS and JOHN A. HENRY, Administrator C. T. A. of the Estate of Avice W. Looper, Appellants.

(98 S. E. (2d) 266)

*Messrs. J. G. Leatherwood* and *C. Victor Pyle,* of Greenville, *for Appellants,*

*Messrs. Leatherwood, Walker, Todd & Mann* and *Frank G. Carpenter,* of Greenville, *for Respondent,* 

May 14, 1957.

STUKES, Chief Justice.

This is an action to establish a contract to make a will. The plaintiff, now respondent and above eighty years of age, in 1933 married as his second wife a maiden lady who was more than thirty years his junior. They had no children, but he has sons and daughters by his former marriage. She was working when she was married and continued at her employment until her death in 1955, at which time she was earning a salary of $260.00 per month. She remained with the same employer for over thirty years—from some time before her marriage until her death.

At the time of their marriage respondent was in poor financial condition and the mortgage on his home had been foreclosed. It was repurchased, title taken to his wife, and together they made the long-continued payments which redeemed it. It constitutes the bulk, at least, of the property which is at stake in this litigation.

In 1942, before the payments on the purchase were completed and before the deed to the property was made to Mrs. Looper, they visited the office of an attorney and at

their direction he prepared, and they executed, wills by which each devised and bequeathed all of the property of the maker to the other, absolutely. Without the knowledge of respondent, Mrs. Looper in 1946 went to the same attorney and had him prepare another will which she executed and by which she devised and bequeathed all of her property to respondent for life, and at his death to her sisters, with contingent provisions in the event of the death of either or both of them during the lifetime of respondent. She died in 1955, after which respondent learned for the first time of her will of 1946.

The action was brought by respondent against the other devisees of the will and against the administrator, c. t. a., of the estate of his deceased wife. In the complaint it was alleged in substance that respondent and his wife entered into a contract in 1942 whereby they agreed to make and keep in force mutual wills whereby each would be the sole beneficiary of the other. Respondent performed his portion of the contract and did not revoke his will during the life of his wife, but without notice to him she subsequently executed her last will, the terms of which have been mentioned, which was in violation of the contract and therefore invalid, whereby the property of the testatrix was impressed with a trust for respondent's benefit in fee simple. The prayer of the complaint was for specific enforcement of the alleged contract and declaration of the trust.

The answer contained a general denial, and the issue so made was tried before the court, without jury or reference. It was the judgment of the court that respondent had made out his case and it was ordered and decreed accordingly.

The appeal of the defendants presents a question of fact which it is the duty of this court to decide, giving due weight to the conclusion of the trial court. Accordingly, we have carefully considered the evidence and have reached contrary conclusion to that of the trial court, wherefore its judgment will have to be reversed.

The most that was established by the testimony of respondent and his other witnesses, nearly all of whom being members of his family, was that the testatrix repeatedly said that she and respondent had agreed to make, or had made, mutual wills. No witness referred to a contract which required that neither should revoke his or her will in the lifetime of the other. And there are no facts in the case which induce the finding of such. An agreement to make "mutual" or reciprocal wills, such as those here, is far short of a contract to keep them in force. In the testimony of the witnesses for the respondent there is the constantly recurring refrain of "mutual wills", as if that were all that is necessary to establish respondent's claim.

The attorney who prepared the reciprocal wills (and also the subsequent will of the testatrix) testified that he had no recollection of the accompanying conversation between him and his clients. If a contract had been mentioned, it is inferable that it would have impressed the attorney and he would have recalled it, which he did not. *Young v. Levy*, 206 S. C. 1, 32 S. E. (2d) 889. And if the reciprocal wills, prepared by him and executed under his supervision, had been pursuant to a contract which was intended to be binding upon the makers, Mrs. Looper would hardly have returned to him to make a conflicting will in violation of the contract.

Nor was the existence of a contract indicated by the testimony of respondent's daughter-in-law that decedent told her that she and respondent had agreed upon, and executed, mutual wills but that she, the decedent, had destroyed hers and made another, and when asked why, according to the witness decedent said that she did not intend for any of the Loopers to have the property. The witness further said that decedent told her, "Don't you dare tell it, because I don't want any trouble. * * *" It is improbable that if the decedent was bound by contract with respondent not to alter her will without notice to him, that

she would have confided breach of it to the daughter-in-law of respondent, with whom he was in close association.

Credulity is strained by other portions of the testimony of this daughter-in-law of respondent. The following excerpt should be considered with it in mind that the reciprocal wills were executed in 1942, the last will of testatrix in 1946, and the case tried in 1956:

"Q. You say she (testatrix) told you that she had a mutual will with Mr. Looper? A. That was what she said.

"Q. Then she in turn said she had torn it up and made another? A. Yes, sir. * * *

"Q. Had she ever talked to you on other occasions about a will or anything else? A. Yes, sir, she told me several times about the will.

"Q. On what other occasions did she tell you about a will? A. Just about every time I came in contact with her.

"Q. When was the first time? A. About three years ago.

"Q. What did she tell you the first time? A. That she and daddy had drawn up a mutual agreement on a will.

"Q. The one you told us about a while ago? A. That was the first time.

"Q. When did she mention it to you again? A. When they would be back to the house, maybe a month later she would be back.

"Q. This is very important, you told us the first time was in July, 1953, when was the next time and where was it? A. It was at my house.

"Q. When? A. I would say in August.

"Q. What did she say then? A. She said she and daddy had drawn up a will, and asked me again, Have you all got your will made, and I would say no.

"Q. Did she go over the same thing? A. Same thing.

"Q. Told you she had destroyed it? A. She sure did.

"Q. She told you she had made out another will? A. Yes, sir.

"Q. What was in the other will? Did she say? A. She didn't say what was in the other will.

"Q. When did she come and talk to you any more? A. About every time I would see her."

The purport of the quoted testimony is that, *beginning in 1953,* every time testatrix would see the witness, her close family connection, which was frequent, she would talk about the mutual wills of *1942* and her subsequent will of *1946.* There was no other evidence of mental aberration of the testatrix.

The first family witness offered by respondent was his daughter, Mrs. Hunter, who testified to a conversation with decedent, her stepmother, to the effect that the latter and respondent had agreed to make, and thereafter to the effect that they had made, mutual wills whereby each would give everything to the other. The witness could not remember the times, not even the months, seasons or years of these conversations and she contradicted herself in at least one particular. On cross examination she said, at folio 57 of the record, that the first such conversation was, quoting, "out home in the den on the porch." Later in the cross examination she said as to the place of the conversation that she did not, quoting from the testimony, "remember exactly what spot in the house but I think in the regular sitting room."

Respondent's own testimony is unsatisfactory, which may have been due to his advanced age. He was eighty-three years old at the time of trial. For example, he testified that he made the first payment, $1,800.00, on the re-purchase of the home; earlier he had said, "Fidelity paid the first two hundred dollars." Because of his age his deposition was taken before trial, but he testified, and it was used by opposing counsel to contradict him. There were conflicts between it and his testimony. Forgetful of many things he frankly admitted on cross examination as to some of his transactions that they had "skipped my (his) mind." With reference to the statement to his daughter and her husband, to which they testified, he said, quoting, "We told them we had made a mutual agreement to draw our wills." And as to his wife's

statement on that occasion he said, "She told Bob and them she would see that I was taken care of", which is not inconsistent with the life estate given him by the last will. Absent the alleged contract, testatrix had the legal right to dispose of her property as she wished. It is a very valuable right, which the courts are zealous to protect and preserve.

Measured by the settled rule of the degree of proof which is required in such cases, the evidence in this case is patently deficient. It is not clear and convincing that there was a contract by which the testatrix was bound not to alter or revoke her first will, at least without notice to respondent.

The following is from the opinion in *McKeegan v. O'Neill*, 22 S. C. 454, 467: "For one to be bound to dispose of his property in a certain way by will, the agreement or contract requiring him to do so must be established by the most satisfactory proof and after the strictest and most thorough examination of all circumstances attending it; or as was said by Chancellor DeSaussure in *Rivers v. Ex'rs of Rivers Ex'rs,* 3 Desaus. 190, 'To be sure, the court would be more strict in examining into the nature and circumstances of such agreements than any others, and would require very satisfactory proof of the fairness and justness of the transaction.' "

*Wilson v. Gordon,* 73 S. C. 155, 53 S. E. 79, 81, involved mutual wills of maiden sisters who lived to old age together. They were close and affectionate, as all agree the husband and wife were in the case in hand. It was found that the evidence did not establish a contract, as we do here. The following are excerpts from the reasoning of the court, opinion by justice Woods: "But where a contract to make or not to revoke a will is set up there are strong reasons for requiring an agreement definite and certain established by evidence clear and convincing. The evidence comes from the living against the dead, who cannot speak in her own behalf in disproof of a charge of the violation of a solemn obligation. For this reason it is obvious little, if any, consideration should

be given to the testimony of those who claim the benefit of such a contract. On account of the secrecy observed by most persons as to the will they expect to make, there is little general discussion of the subject, and it is therefore difficult to disprove any intention or agreement attributed to a testator. Again, the discussion by two persons bound to each other by the closest ties of affection as to disposition of their property, resulting in separate wills by which the property of each was left to the other, affords no grounds for the inference that either undertook or exacted a legal obligation. Such action may be far more reasonably attributed to the promptings of affection, and courts should not introduce the mercenary element, except upon clear affirmative proof that it was present within the understanding of both parties. * * * That the wills were made at the same time is of little, if any, significance when the close association and common life are considered. * * * All the facts relied on as implying a contract to make mutual wills are entirely consistent with the absence of contract, and the presence of the union of life and mutual affection as the impelling motive. * * * The evidence is far from clear and convincing that Jane L. Gordon made an intentional offer to make a will as a consideration for a will to be made by her sister, or that her sister intentionally accepted such an offer, or that Jane L. Gordon made any absolute representation that she would make a will in order to induce her sister to make one of like import in her favor. The right to dispose of property by will would be seriously jeopardized if it was held to be surrendered upon such meagre proof as is here offered."

Bachelor brothers made mutual wills in *Dicks v. Cassels*, 100 S. C. 341, 84 S. E. 878, 879, after which one of them made another conflicting will and died. The survivor claimed that the mutual wills were made pursuant to a contract that they should be irrevocable. The evidence was held insufficient to prove the alleged irrevocability under the rule which was reaffirmed in the following language of the court: "To establish an agreement such as is claimed by the plaintiff here, the proof must be definite, certain, clear, and convincing."

The rule was reiterated and applied with the same result in *Kerr v. Kennedy,* 105 S. C. 496, 90 S. E. 177, 178. In the opinion in the latter case these questions were posed *arguendo,* and answered in the negative under the evidence there, as we do here: "Was there a meeting of the minds between Mrs. Sloan and the plaintiffs that the will made in 1894 was a binding mutual contract enforceable in law between them? Was the will the binding contract between them fixed and irrevocable, and did they so regard it, or was it simply a declaration of Mrs. Sloan that at that time she intended them to have her property after her death, but reserving the usual right that all people have of changing her mind and revoking her will and dying intestate or disposing of her property differently by making another will?" *Brown v. Golightly,* 106 S. C. 519, 91 S. E. 869, was of like result. The evidence did not meet the required measure of proof; it was not sufficiently clear, definite and certain—per the opinion of Justice Hydrick. In *Erskine v. Erskine,* 107 S. C. 233, 92 S. E. 465, 467, it was said in respect to a contract to devise: "But such a contract, especially when it is attempted to be established by parol, is regarded with suspicion, and not sustained, except upon the strongest evidence that it was founded upon a valuable consideration and deliberately entered into by the decedent. The evidence to sustain it should be received and scrutinized with the greatest care. The terms of such an agreement should be definite and certain and established by evidence clear and convincing." It was further said, applicable here: "The uncontradicted evidence shows that Mrs. Erskine was a very strong-minded woman. It is not likely she would have deliberately breached her contract, especially a contract made with her own son who lived with her so many years. The more probable view is that a woman of her strong character would have carried out her contract, if she had any. * * *"

The foregoing authorities were reviewed and reaffirmed in *Young v. Levy,* 206 S. C. 1, 32 S. E. (2d) 889. They show no doubt of the stringency of the rule with respect to the quantum of proof which is required in such cases.

The contract between husband and wife for the final disposition by will of the property of the latter was enforced in *Stuckey v. Truett,* 124 S. C. 122, 117 S. E. 192, 194, but the rule was expressly recognized that, quoting, "[the] testimony in a case of this kind must be clear, definite, and convincing. It must more than preponderate. It must be clear and must convince."

*Ellisor v. Watts,* 227 S. C. 411, 88 S. E. (2d) 351, involved a joint will of husband and wife which contained no expression or evidence that it was the result of a contract. Our cases which were concerned with reciprocal wills, contemporaneously executed, were held to be analogous, and proof of contract, called testamentary compact, equally necessary. In the absence of evidence of contract to the contrary, the survivor of the joint testators was held not to be bound to leave the will unrevoked and unaltered. The necessity of evidence implies more than mere preponderance and in the degree required by our several decisions which have been cited.

*McLauchlin v. Gressette,* 224 S. C. 296, 79 S. E. (2d) 149, 159, was a case in which the evidence of contract to make a will of specified terms was found to be "clear and convincing", and the contract was enforced accordingly. It was expressly concluded: "that plaintiffs have established the existence of the contract by testimony which meets the stringent requirements of the law in cases of this kind." There is, of course, no conflict between that case and those that have been cited as controlling of the case at bar. The same comment may be made upon *Baylor v. Bath,* 189 S. C. 269, 1 S. E. (2d) 139.

Mention is made of the two last-cited cases because they are cited in respondent's brief. However, we think that they are distinguished by the evidence adduced in them and that, therefore, they are inapplicable to the case *sub judice.*

Other recent relevant cases are *Samuel v. Young,* 214 S. C. 91, 51 S. E. (2d) 367, 370, and *Kirkpatrick v. Kirkpat-*

*rick,* 223 S. C. 357, 75 S. E. (2d) 876, which were of opposite result. In the former it was said with respect to the requisite quantum of proof in such cases: "Such proof by one who invokes the aid of equity should not consist of vague or shadowy evidence or by a mere preponderance of evidence, but by evidence so unquestionable in its character, so clear, cogent and convincing, that no reasonable doubt can be entertained of its truth; that no such doubt can linger, either as to the existence of the contract or the certainty of its terms, or that the plaintiff has wholly performed on her part."

There is an annotation upon the subject of joint, mutual and reciprocal wills in 169 A. L. R. 9, which supersedes earlier similar annotations. The high degree of proof which is required by the courts generally to establish a contract for irevocability of such wills is found at page 65 of the annotation. It is seen that our cases which have been cited are rather typical in this respect. For the following, relating to reciprocal wills of husbands and wives, decisions of several jurisdictions are cited in the footnotes to page 76:

"Reciprocal bequests in separate wills of husband and wife are not in themselves sufficient proof that the wills were executed pursuant to an agreement to make wills that should stand without revocation. In order to establish that separate wills containing reciprocal provisions were the result of a contract between the testators, there must be proof of the contract *aliunde* the wills, notwithstanding that the testators were husband and wife. The wills of husband and wife executed at the same time, before the same witnesses, and strictly reciprocal in their terms, are not, in the absence of a recital that they are made pursuant to a contract, in themselves sufficient evidence of an enforceable contract between the testators for the execution of the wills."

Reverting to the evidence in the case at hand, respondent's daughter, to whose testimony reference is made above, said that she advised respondent and decedent to make mutual wills, adding, quoting from her testi-

mony, "that was what most couples did." It may be said in agreement that it is within common knowledge that many married couples make reciprocal wills; but it does not follow from that alone, or from the agreement to do so, that each spouse is thereby bound against revocation or subsequent alteration of his or her will, without notice to the other. This we find to be such a case and such as was within the contemplation of the witness whose testimony we have quoted. There was advice and agreement to make reciprocal wills, but not that they should be irrevocable.

The judgment of the trial court is reversed.

TAYLOR, LEGGE and MOSS, JJ., concur.

OXNER, J., not participating.