1582

Bobby E. RUTHERFORD, Appellant v. Carol RUTHERFORD, Respondent.

(401 S.E. (2d) 177)

Court of Appeals

*Stevens B. Elliott,* Columbia, *for appellant.*

*Nathan M. Crystal* and *Kenneth M. Mathews,* Columbia, *for respondent.*

Heard Oct. 17, 1990; Decided Dec. 10, 1990.

On Rehearing Feb. 5, 1991.

SHAW, Judge:

Appellant husband Bobby E. Rutherford instituted this action against respondent wife Carol Rutherford for a divorce on the grounds of adultery and for the denial of alimony. The family court denied husband a divorce and granted wife alimony in the amount of $400 per month and other relief. We reverse and remand.

In appeals from the family court, this court can make findings of fact based on its own view of the preponderance of the evidence. *Baker v. Baker*, 286 S.C. 200, 332 S.E. (2d) 550 (Ct. App. 1985).

The question we are asked to resolve is novel in South Carolina. The question is whether wife, who suffers a multiple personality disorder is entitled to alimony despite evidence that she committed adultery, and, concomitantly whether husband is entitled to a divorce. Here, there is sufficient proof that Mrs. Rutherford's body committed adultery. The question is now whether she as a cognitive person or as a disengaged alter ego committed adultery.

## HUSBAND'S TESTIMONY

The parties were remarried on September 10, 1982 after being divorced in 1967. Both parties had intervening marriages. The husband stated wife was in Charter Rivers Hospital in September 1988 and received flowers from Claude Tedder who was also a patient there. He found Tedder's name, address and telephone number hidden in wife's make-up kit. While she was in the hospital, they discussed with a doctor the possibility of living separate and apart. On September 13, 1988, wife was discharged from the hospital. Husband agreed to support her and to set her up in an apartment. On September 17, wife told husband she was going to spend the night with a girlfriend who lived in the same trailer park as Tedder. At 9:00 p.m., husband went to the location and saw wife park her car and go inside Tedder's trailer. He observed the lights being turned off around 12:00 midnight. He remained there until 3:00 a.m. when he left to get a friend to witness the occurrence. He and Jay Campbell remained there until 5:00 a.m. They left to get a camera and returned to stay until 12:00 noon. No one exited the trailer during the 15 hour period.

The husband hired a detective on September 23. The detective told him he had evidence wife had been at the trailer several times.

The husband stated he had not observed any other personality or that wife was going by any other name than Carol. He said she had mood changes and never acted differently or identified herself as another person during sexual intercourse.

Husband testified wife worked "short stretches" during their marriage (two to six weeks). Her jobs included sales clerk at Revco, waitress, and sales clerk at Zippy Mart. She attended three quarters at technical college. Wife performed about 50% of the household duties and kept the house clean. She never exhibited an inability to work. The first time he heard anyone say she could not work was Dr. Nelson at Charter Rivers.

## WIFE'S TESTIMONY

Wife testified she has a tenth grade education and that she attended a business school for a year. She has worked at several jobs but now claims she is unable to work. She stated she did most of the housework and took care of her children. She described the marriage as "rocky."

At the time of the hearing she was out on a pass from Charter Rivers Hospital. It was there she met Claude Tedder. She first learned of her multiple personalities in July 1988 when she was diagnosed as suffering from manic depression, schizophrenia and nymphomania. After learning of this, she began to study about the multiple personalities and the schizophrenia and admitted trying to hide the other personalities.

The following exchanges took place:

Q: All right. Referring to the times in which you switch into a personality and you're aware of it and you want to hide it, how do you go about that?

A: Just like I'm doing right now.

Q: So you're presently in another personality right now but you're hiding it?

A: That's right.

After this exchange, she identified herself as Diedra and as Diedra she denied sleeping with Claude Tedder. She stated

that Carol has not slept with Tedder. She was asked if Rose had slept with Tedder and she said "perhaps." She stated that Diedra and Rose are not friends but that Carol was "okay sometimes but she's weak."

She said Rose began calling Tedder when she (Rose) began having problems with the husband. She then identified herself as Carol and stated that when she attempted to talk to Rose there is a buzzing in her head. As a part of her therapy, she keeps a journal about the various personalities but did not enter anything in the journal about Rose and Tedder.

Wife applied for SSA benefits. Her application was approved and she thinks she will receive $200 to $250 monthly. She receives $180 in child support from her second husband (whom she married between marriages to husband). She stated that she needed support and asked for $500 to $700 monthly alimony. She is on his health insurance but has unpaid bills. She needs continued treatment to recover.

Bonnie Rutherford, the parties' daughter-in-law, testified that on September 24, 1988, wife told her by telephone to tell husband that "his satisfactions been satisfied because she slept with Claude." She identified herself as Carol. She stated that wife left Claude's telephone number as a way to contact her.

## DR. NELSON'S TESTIMONY

Dr. Larry W. Nelson is a psychiatrist at Hall Institute and is an expert in dissociative disorders. He has been treating wife since 1988 and diagnoses her as having major depression, multiple personality disorder, arthritis, hypothyroidism, Reynaud's syndrome, irritable bowel syndrome and urethral stenosis. Regarding the dissociative disorder or multiple personality disorder, he identified 21 or 22 separate personalities in wife and stated that switches from one to the other may be spontaneous or triggered by stress. Four or five are childlike personalities which she created when she was being sexually abused as a child. Others are teenage personalities, some in 20's and others in 40's and 50's. He states that a person's physiology causes different brain waves from one personality to another. Wife cannot cannot generally bring out the personalities on her own and personalities may last from a few seconds to several months. On questions from the court, Nelson stated

a person can fake the disorder and he stated that wife may not know what she is doing in another personality state including having sex with another man. He said the "Rose" personality told him of the affair with Tedder and stated that wife Carol does not remember it or know anything about it. He further described the extreme multiple personality disorder as a form of dissociation of memories from the past and can be totally separated from the stream of consciousness. He analogized this structure with a television set in that as one observes the viewing channel the programs are still being conducted on other channels simultaneously. He stated that wife has a different set of memories and recordings for each personality.

On cross examination, Dr. Nelson retreated to a large degree from his direct testimony. The following exchanges took place on cross examination:

Q: Does each one of these personalities have the diagnoses of all seven of those diagnoses that you gave?

A: I'm not sure. One of the fascinating things about this disorder is that the person's physiology changes from one personality state to another. And they've done some very sophisticated studies at the National Institute of Mental Health; the electroencephalogram, for example, will change from one personality state to another.

\* \* \* \* \*

Q: Well, let's say for instance, what is the name of another one of her personalities other than Carol?

A: There's Diedra, Roberta, Little Carol, Shirley, Jane.

Q: Let's take Roberta. Does Roberta have arthritis?

A: I'm not sure.

\* \* \* \* \*

Q: Do all 21 or 22 personalities occupy the same physical body?

A: Yes, they do.

Q: Now, you said in your testimony that actions in one personality may or may not remember what occurred in another personality; is that not correct?

A: That's correct.

\* \* \* \* \*

Q: Well, does Diedra know that Carol Rutherford is engaging in the personality of Roberta when it's occurring?

A: I don't know.

Q: You don't know whether the other 20 personalities are in fact an audience to what is happening in the 21 personality?

A: No, we don't always know.

Q: And you don't know whether they understand what they're doing, or whether they forget what they're doing, or realize what they're doing at the time they're doing it?

A: I don't. The only way to try to find out is to ask questions, and then you have to depend on the truthfulness of the personality state as to whether the question is answered correctly or not.

\* \* \* \* \*

Q: Isn't it true that each one of these personalities knew who Bobby Rutherford was, her husband?

A: I'm not sure if that's true or not. I can say generally from my work with M.P.D. patients that the other personalities do not recognize the spouse, they recognize them as somebody who, in this case, Carol lives with.

Q: Now, Doctor, you testified that Carol Rutherford was competent to engage in this litigation?

A: Yes, I did.

Q: And she is competent to go through a divorce proceeding.

A: Yes, I did.

Q: And you placed no qualification on that whatsoever.

A: No, I didn't, other than she was not suicidal. That's why, as you know, the previous hearing was postponed because of that.

\* \* \* \* \*

THE COURT: I have a couple. My first one is can you fake it?

THE WITNESS: Yes, you can.

THE COURT: Now, you've indicated that with 20 personalities that she remembers everything consistent

with that personality that she brings out; is that correct?

THE WITNESS: Yes.

THE COURT: All the details?

THE WITNESS: Yes.

THE COURT: And so there's at least 20 personalities that you have notes of that she's been consistent with this personality through your therapy; is that right?

THE WITNESS: That's correct.

We feel that Dr. Nelson used generalities when confronted with specific questions about the consciousness of wife's activities.

Our Supreme Court dealt with a similar situation in *Shaw v. Shaw*, 256 S.C. 453, 182 S.E. (2d) 865 (1971). There the court held that our divorce statute does not contain any exception applying to a situation where separation results from the commitment of one of the parties. They reasoned, however, that the separation contemplated by the statute must be of parties who are sufficiently competent to be conscious of the fact that separation has occurred and the divorce was denied. In *Shaw*, the wife was a permanent patient in the South Carolina State Hospital and was represented by a guardian ad litem and appointed counsel at the hearing.

South Carolina Code, Section 20-3-130 provides, in part, "No alimony shall be granted an adulterous spouse." Adultery on wife's part operates to discharge husband from all obligations to support her. *Watson v. Watson*, 291 S.C. 13, 351 S.E. (2d) 883 (Ct. App. 1986).

There is no question but that the wife in her "Carol personality" is competent to commit adultery and to engage in the present litigation. The question before this court is to what extent Carol's mental abnormality or condition, or as the trial judge termed it, "disability," excuses her from legal responsibility for her commission of acts of sexual intercourse with Mr. Tedder under the circumstances of this case.

The husband has shown by circumstantial evidence the wife committed adultery with Tedder. It then becomes her burden to show she should be excused from responsibility for the act because one of her uncontrollable personalities committed the act.

The trial court found the personality that committed adultery was that of Rose, not Carol (the personality married to the appellant). Our concern in this case is whether Carol has the ability to consciously engage the Rose personality. If it is determined that she has that adeptness, then our concern is that she may have conveniently utilized her psychological disorder to engage in adultery with Tedder which, as Carol, she knew was wrong.

We have reviewed the facts of this case and we are not convinced the "Carol personality" did not at least have control over the transformation of her conscious self from that of Carol to Rose. It is clear Carol knows that Rose committed adultery. One witness testified that in her "Carol personality," Carol told her she had had sex with Tedder. Further, her therapist testified that it was possible for Carol to fake these personalities and he was not certain how one personality interacted with another. The wife has not convinced us that the commission of the act of adultery by her "Rose personality" could not be controlled by her Carol personality, and, was thus, involuntary.

To sustain the trial court's ruling under the facts of this case would tend to encourage promiscuity and relax conduct relative to other fault grounds for divorce where there is the presence of some mental abnormality. Such a proposition would distort the intent of our Supreme Court in *Shaw, supra,* of protecting helpless and blameless spouses.

We hold that for us to sustain the wife's defense, she was obliged to show by clear evidence that her mental condition deprived her of the ability to control the various personalities that she found herself in. We cannot in good conscience say the wife was a helpless and blameless person when she committed the acts of adultery with Tedder.

Accordingly, we reverse the order of the trial court and remand with instructions to enter judgment for the husband on the ground of adultery.

Reversed and remanded.

CURETON, J., and BRUCE LITTLEJOHN, Acting Associate Justice, concur.

## ORDER ON PETITION FOR REHEARING

In her petition for rehearing the Respondent, Carol Rutherford, raises the issue of whether this court has unfairly discriminated against the mentally ill as a class by requiring her to establish her defense to adultery by "clear evidence," a higher standard of proof than the usual standard of preponderance of the evidence. There may be merit to such an argument. We therefore modify our opinion to require Respondent, Carol Rutherford, to prove that her mental condition deprived her of the ability to control her various personalities by a *preponderance* of the evidence. We hold, however, that she did not meet that burden of proof.

Respondent, Carol Rutherford, also argues in her petition for rehearing that our standard of review of family court issues is restricted by *S.C. Code Ann.* Section 14-3-320 (Supp. 1990) to a consideration of whether there is "substantial evidence" to support the family court's findings. We disagree.

A divorce proceeding is a proceeding in equity. *Roberts v. Roberts*, 299 S.C. 315, 384 S.E. (2d) 719 (1989). Article V, Section 5 of the South Carolina Constitution provides "the [Supreme] Court shall have appellate jurisdiction only in cases of equity, and in such appeals they shall review the findings of fact as well as the law. . . ." This same standard applies to this court since we derive our jurisdiction by transfer from the Supreme Court pursuant to *S.C. Code Ann.* Section 14-8-260 (Supp. 1990).

Our Supreme Court has consistently interpreted the constitutional language quoted above to mean that in equity cases it may decide fact issues based upon a preponderance of the evidence. *Miller v. Miller*, 299 S.C. 307, 384 S.E. (2d) 715 (1989); *Gilbert v. McLeod Infirmary*, 219 S.C. 174, 64 S.E. (2d) 524 (1951); *Young v. Levy*, 206 S.C. 1, 32 S.E. (2d) 889 (1945). It is settled law that where a statute is repugnant to the constitution, it cannot prevail. *University of South Carolina v. Mehlman*, 245 S.C. 180, 139 S.E. (2d) 771 (1964); *Southeastern Home Building & Refurbishing v. Platt*, 283 S.C. 602, 325 S.E. (2d) 328 (1985). To the extent Section 14-3-320 is repugnant to Article V, Section 5 of the South Carolina Constitution, the statute is void.

We have carefully reviewed the remaining bases for Mrs. Rutherford's petition for rehearing and find them to be without merit. Her petition for rehearing is therefore denied.

The South Carolina Protection and Advocacy System for the Handicapped, Inc. and the Mental Health Association of South Carolina have petitioned for leave to file an amicus curiae petition in support of Mrs. Rutherford's petition for rehearing. This court grants that petition, has considered the petition, but finds it unpersuasive except to the extent it relates to the modifications we have made to our opinion.

SHAW and CURETON, JJ., and BRUCE LITTLEJOHN, Acting Associate Justice, concur.