Mark TENNER, Appellant,

v.

Toni TENNER, Appellee.

No. 94–SC–660–DG.

Supreme Court of Kentucky.

July 6, 1995.

Rehearing Denied Oct. 19, 1995.

Stanley K. Spees, Paducah, for appellant.

Charles W. Brien, Benton, for appellee.

STEPHENS, Chief Justice.

The narrow issue we address on this appeal is the correct standard of proof necessary, in a marriage dissolution action, where a spouse who is at fault attempts to mitigate or excuse that fault, while seeking maintenance, by alleging the mental illness of multiple personality disorder. Believing that the Court of Appeals applied a too limited standard, we reverse.[1]

---

1. As will be seen, we are forced to consider this esoteric area of the law because of the continued viability of the case of *Chapman v. Chapman*, Ky., 498 S.W.2d 134 (1973), in which this Court's

The parties to this action were married in 1978 and lived together until 1990. The husband worked as an engineer and earned $45,000 per year. Appellee worked in the home as a homemaker. Until 1988, that is. While a student at Murray State University, she took to herself a lover and engaged in a sustained course of adultery, regularly, telling her husband about it. When the affair ended, appellee "took up" with another man. This dissolution action resulted.

In an effort to erase her admitted fault, appellee introduced medical evidence that she suffered from a condition known as multiple personality disorder (hereinafter MPD). It is a fair inference that both parties' medical witnesses agree that appellee did suffer from some degree of MPD. Their medical opinion differences will be discussed later. The crux of appellee's defense to this admitted fault was that the "person" who committed adultery was not the same person who was married to appellant, even though they occupied the same body. This "logic" was termed "psycho-babble" by the dissenting opinion in the Court of Appeals.

The domestic relations commissioner initially found, as a matter of fact, that appellee failed to sustain her burden of proof that she lacked control over her "switching" from one personality to another. Applying standards which required appellee to show by "clear and convincing" evidence that she did not have control of the "switching," he reduced her request for maintenance of $1,103.23 per month to an amount of $500.00 per month for 48 months.

The trial court affirmed the commissioner, stating:

> The Commissioner followed *Rutherford v. Rutherford* [303 S.C. 424], 401 S.E.2d 177 (S.C.1990). The Court agrees with the commissioner that such rule should be followed as the law in this state except that the standard applied to the "switching"

issue is that of a "preponderance of the evidence" and not that of "clear and convincing evidence."[2] Further, the Court agrees with the Commissioner that the petitioner did not show that she lacked the degree of control over her switching into the personality of Andrea that would relieve her from a finding of fault.

The Court of Appeals in a 2–1 decision, its view as follows:

> The issue in this case is not whether Toni had a adulterous affair. Admittedly, she did. The issue is not whether she could control either the presence of the personality of "Andrea" or Andrea's actions once Andrea did appear. Regardless of the amount of "control" Toni had over "switching," the evidence in this record, particularly that of the expert witnesses, established that a mentally healthy person cannot switch from one personality to another and that Toni, at the time of her affair, was profoundly mentally ill. *The issue, as far as maintenance is concerned, is whether Toni's mental condition excuses her "fault."* Without hesitation we hold it does. (emphasis added.)

In reversing the trial court's decision and remanding the issue to that court, the Court of Appeals attempted to establish the following "standard" of proof: "a spouse seeking maintenance need only establish a causal link between alleged misconduct and his or her mental condition to overcome any attempt to reduce sums otherwise appropriate."

In remanding the case, the majority directed the trial court to make an appropriate award without consideration of appellee's misconduct, and for such duration that is consistent with the treatment for MPD.

 It is certainly true that both doctors—that of the appellant and that of the appellee—established the fact that appellee had some degree of MPD. However, the

---

predecessor, by judicial fiat, injected the issue of fault into the law in spite of the legislatively enacted *no-fault divorce* statute.

The author of the opinion, as will be seen in a separate opinion, believes *Chapman* to be clearly wrong.

2. Although not specifically noted at this point in the trial court's Order, the commissioner had relied upon the decision of the South Carolina Court of Appeals in its application of the "clear and convincing" standard, but this standard was rejected on rehearing in favor of the "preponderance of the evidence" standard, which Judge Buckingham endorses.

evidence of appellant's doctor clearly shows a disagreement with appellee's doctor in several key issues. The husband's physician, contradicted the wife's physician, and emphasized the following matters: (1) The value of appellee being employed; (2) Her lack of motivation if allowed to be totally dependent on maintenance; (3) The likelihood of her mental condition to deteriorate if she was not required to contribute to her own well-being; (4) Her susceptibility to being "coached" by her doctor; (5) Her definite ability to control her "switching" from one personality to another; (6) Her use of the MPD diagnosis as an excuse for wrongful behavior; and (7) His belief that she was not seriously impaired by her disease.

█ The impact of the standard adopted by the majority of the Court of Appeals is to adopt *no standard*. All that is required is to establish a "causal link" between the misconduct and his or her mental condition in order to defend fault. No degree of proof to establish the "causal link" is set forth. No guidance to the fact-finder is given. The door is swung wide open for any type of "mental condition" to negate any kind of fault.

The Court of Appeals—without setting any viable or identifiable standard—and while ignoring the finding of fact by the trial judge that appellant *did have* some control over the "switching" of personalities (thus clearly indicating that she was not totally or fully controlled by the MPD), declared, as a matter of law that she was mentally ill and that "fact" obviated her admitted fault.

We agree with the trial court that the standard of proof necessary in this case is properly set forth in *Rutherford v. Rutherford*, 307 S.C. 199, 414 S.E.2d 157 (1992). In that case, the husband brought a divorce action based on the adultery of the wife. As an alternate defense, the wife, at trial, argued that even if she had committed adultery she should not be held responsible due to her suffering from MPD. Analogizing to criminal law, in affirming the standard of proof adopted by the Court of Appeals on rehearing, the South Carolina Court:

A defendant is excused from responsibility for his or her acts only if as a result of his or her mental disease or defect he or she

lacks the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong ... *We are not convinced a lower standard of mental impairment in a divorce action is appropriate ... We also find that the sum degree of mental impairment must be proven to avoid the statutory bar of alimony for an adulterous spouse.* Therefore, in order to avoid the husband's action for divorce on the grounds of adultery and the bar of adultery, *the wife bears the burden of proving by the preponderance of the evidence that the time she committed adultery, she was unable to appreciate the wrongfulness of her conduct. Id.*, 414 S.E.2d at 161. (emphasis added.)

We believe that this standard places a fair burden—i.e., a preponderance of the evidence—upon the spouse at fault, to show the extent to which he or she was mentally ill and that because of the mental illness he or she was not able to appreciate "fault" because of the mental illness.

█ In the present case, ultimately both the domestic relations commissioner and the trial judge applied this standard. The finding was that the appellant, based on her ability to "switch" personalities, was not under control of the MPD and therefore she was able to appreciate the wrongfulness of her conduct. Under all too familiar legal principles, an appellate court cannot substitute its judgment for that of the fact-finder unless that judgment was clearly erroneous. In this case, the evidence of appellant's doctor was clearly sufficient to justify the trial court's finding of fact. This alone justifies reversal of this case.

Moreover, it is the view of a majority of this Court that the "standard" applied by the Court of Appeals was in error, and we believe that the *Rutherford* standard, as noted, is the correct one.

Under these circumstances, we reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

LAMBERT, REYNOLDS, SPAIN, and WINTERSHEIMER, JJ., concur.

STEPHENS, C.J., files a separate concurring opinion.

STUMBO, J., would overrule *Chapman v. Chapman*, Ky., 498 S.W.2d 134 (1973) and concurs with the separate concurring opinion of STEPHENS, C.J.

D. SCOTT FURKIN, Special Justice, files a separate dissenting opinion.

STEPHENS, Chief Justice, concurring.

As indicated, it is my view that entertaining the appeal in this case was necessitated by the existence of the *Chapman v. Chapman*, Ky., 498 S.W.2d 134 (1973). *Supra*, cited in majority opinion.

In that controversial case, the Court, in spite of a legislatively enacted *no-fault* divorce statute, declared that fault, while not to be considered in determining *whether* a spouse is entitled to maintenance, *may, nevertheless, be considered as to the amount of that maintenance.*

The rationale advanced by the Court is as follows:

Be that as it may, *it is for this court to interpret the law, not to enact legislation.* It is noted that the Act presents two requisites for maintenance: One, that the spouse seeking maintenance lacks sufficient property to support himself, and two, he is unable to support himself through appropriate employment, or is the custodian of a child which prevents his seeking employment. It is plain up to this point that fault is not to be considered. The next subsection provides that the "maintenance order shall be in such amounts and for such periods of time as the court deems just, and after considering all relevant factors including: * * *." This provision throws wide open the chancellor's discretionary considerations insofar as the amount is concerned. What *might* be deemed "just" *could very well* include marital misconduct.

*Id.* at 137. I will not burden the reader and unduly lengthen this dissent with an extensive criticism of the *Chapman* opinion. It is my belief that the *Chapman* opinion opens— in part—that which the No–Fault Act intended to close; i.e., the injection of fault into a divorce case. What does the statute itself say? KRS 403.110 is as follows:

This chapter shall be liberally construed and applied to promote its underlying purposes, which are to:

(3) *Mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of the marriage.* (emphasis added.)

Once a financial determination has been made by the trial court that a spouse is needful of maintenance, and that the other must pay, based on the need of one and the ability of the other to pay, of what possible relevance is fault? The purpose of the no-fault statute—as specifically is stated—is to "mitigate potential harm to spouses and children caused by the process of dissolution of the marriage." What could be more harmful to children and their spouses than to open up the can of worms of fault? Nothing!

For additional thoughts on the correctness of *Chapman*, I invite the readers to read *Platt v. Platt*, Ky.App., 728 S.W.2d 542 (1987). In addition, Judge Johnstone, in a concurring opinion to the Court of Appeals majority in the case *sub judice*, states his view of *Chapman*,

I concur in several important points made in the majority's opinion. First, it may well be time to revisit the issue of whether fault should be considered at all when determining an appropriate award of maintenance. Even the *Chapman* Court recognized that seldom is one party blameless and the other without some redemptive features. *Fault, by the very nature of the evidence it evokes, has the tendency (1) to exacerbate the problems which cause the breakdown of a marriage; (2) to cause further damage to the parties and children, if any, at a point when redemption and reconciliation are needed; and (3) to blur the other issues that trial judges must resolve.*

Second, KRS 403.200 is designed to be rehabilitative, not punitive. *The goal is to assist the party seeking maintenance to become self-supporting, if possible, within a reasonable length of time.*

Third, *it is absurd to use fault in an attempt to punish a spouse who is mentally ill, or to use his or her mental illness as a bar to maintenance.* The majority makes the important point that Kentucky has refused for many years to deny maintenance to a spouse due to marital misconduct which was attributable to a disturbed mental condition.

I think, however, that we need go no further than to reiterate such holding. If a spouse seeking maintenance can prove that marital misconduct was caused by a recognized mental disease or condition, that marital misconduct shall not be used to diminish an award of maintenance. (emphasis added.)

I totally agree with Judge Johnstone.

In the present case, if *Chapman* were not rearing its ugly head, the only issue to have been decided would have been appellee's financial needs and abilities, and the appellant's similar financial needs and abilities. Those (and others) are the queries authorized by the statute. Fault has no relevance to the issue in this case—or for that matter—in *any* case under the No–Fault Act.

I would overrule *Chapman.*

D. SCOTT FURKIN, Special Justice, dissenting.

Respectfully, I dissent. I believe the Court of Appeals arrived at the right result via the wrong route. This Court charted a proper course but nevertheless went astray.

I acknowledge that *Chapman v. Chapman,* Ky., 498 S.W.2d 134 (1973), does permit trial courts to consider marital misconduct for the limited purpose of setting the amount of a spouse's maintenance award after entitlement to maintenance has been established. There is much to be said for the view that evidence of misconduct has no rightful place in a no-fault divorce system; but unless and until *Chapman* is overruled, its holding prevails. Still, marital misconduct is but one factor to be considered in setting the amount of maintenance and should ordinarily be used to reduce an otherwise appropriate award only when necessary to prevent a windfall.

I also acknowledge that an appellate court should not disturb a trial court's factual finding unless that finding is clearly erroneous. However, when the finding is palpably against the clear weight of the evidence, it is both an appellate court's prerogative and duty to reverse it in order to prevent an injustice.

With these principles in mind, I turn to what I see as the only real issue in this case: Did the appellee sustain her burden of proving that she suffered from a mental disease or condition sufficient to excuse her admitted marital misconduct? Based on the evidence in this record, I believe she did.

The appellee's treating psychiatrist testified that she suffers from multiple personality disorder (MPD), a dissociative disorder recognized by the American Psychiatric Association in which complex behaviors take place outside the awareness of the patient's predominant consciousness and are completely forgotten by the patient afterward. He diagnosed the appellee's MPD while she was hospitalized for depression and suicidal ideation, and he had treated her with individual and group psychotherapy for over two years at the time of his testimony.

He explained that during therapy the appellee exhibited at least thirteen different alter personalities, many of whom were demonstrated on videotape, which came out in full control of her ego. While the appellee had shown improvement during the course of her treatment, according to his testimony she still had psychogenic memory loss, switched involuntarily to alter personalities and was very inconsistent in her behavior. Nevertheless, he was hopeful that with continued therapy she would be able to "fuse" all her alter personalities within three to five years.

A qualified psychiatrist retained by the appellant to evaluate the appellee also testified in the trial court. Although he allowed that MPD is "somewhat controversial in psychiatry," he conceded that it is a recognized dissociative disorder. More importantly, he concurred that the appellee does suffer from MPD as well as anxiety, depression and dependency. Based on his one-hour evaluation which occurred after the appellee was well into her treatment, he opined that she may

have some control over switching into alter personalities at the same time acknowledging that she lacked some control. The only real substantive difference between his conclusions and those of the appellee's psychiatrist had to do with the therapeutic value of her being employed.

The testimony of the parties' experts is strikingly similar. The only medical evidence before the trial court leads inescapably to the conclusion that at the time of her marital misconduct the appellee was seriously mentally ill. In my view, both the trial court and this Court have given undue emphasis to whether the appellee lacks all control over her "switching." As observed by the Court of Appeals: "Regardless of the amount of 'control' [the appellee] had over 'switching,' the evidence in this record, particularly that of the expert witnesses, established that a mentally healthy person cannot switch from one personality to another...."

Nevertheless, I believe that the standard of proof for excuse of fault adopted by the Court of Appeals—mere establishment of a "causal link" between a spouse's misconduct and his or her mental condition—is insufficient. To this extent, I agree with this Court that a spouse resisting reduction of an otherwise appropriate maintenance award must show by a preponderance of the evidence that by virtue of a mental disease or condition, he or she was unable to appreciate the wrongfulness of his or her conduct. This is the standard of proof enunciated by the Supreme Court of South Carolina in *Rutherford v. Rutherford,* 307 S.C. 199, 414 S.E.2d 157 (1992).

I part company with this Court only over its holding that the appellee has failed to sustain her burden of establishing a mental disease or condition sufficient to excuse her marital misconduct. As I have indicated, the proof is overwhelming in this regard. For many years, Kentucky law has refused to withhold deserved maintenance from a spouse due to marital misconduct attributable to mental illness. See, e.g., *Snider v. Snider,* Ky., 302 S.W.2d 621 (1957). The most unfortunate result of the Majority's decision in this case that is it condones punishment for mental illness. In my opinion, this

is a step in the wrong direction and is entirely at odds with the rehabilitative purpose of our maintenance statute.

I would reverse so much of the Court of Appeals' decision as concerns the standard of proof, but affirm its remand of the case to the trial court for determination of a proper maintenance award without consideration of the appellee's marital misconduct.